## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

CENTER FOR BIOLOGICAL DIVERSITY,
WATERKEEPER ALLIANCE, INC., and
RIVERKEEPER, INC.,

       Plaintiffs,

       v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and ANDREW
WHEELER, in his official capacity as
Administrator of the United States Environmental
Protection Agency

       Defendants.

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Waterkeeper Alliance, Inc., and

Riverkeeper, Inc. (collectively, "Conservation Groups") challenge the failure of Defendants U.S.

Environmental Protection Agency and Administrator Wheeler (collectively, "EPA") to comply

with their mandatory duties under the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA"

or the "Act"). Defendants violated the ESA by failing to initiate and complete ESA Section 7

consultation to ensure that EPA's actions in response to the COVID-19 pandemic—as described

in a March 26, 2020 Memorandum entitled "COVID-19 Implications for EPA's Enforcement and

Compliance Assurance Program" setting forth EPA's policy regarding suspension of enforcement

of environmental legal obligations (the "Non-Enforcement Policy")—will not result in jeopardy

to listed species or in the destruction or adverse modification of such species' critical habitat.

2.      EPA's Non-Enforcement Policy suspends monitoring and reporting requirements

under the Clean Water Act, Clean Air Act, Safe Drinking Water Act, Resource Conservation and

Recovery Act, and Emergency Planning and Community-Right-to-Know Act. Many permits

issued under these statutes contain specific requirements and limitations designed to protect listed species and critical habitats. Suspension of monitoring and reporting requirements therefore creates an immediate and serious risk to imperiled wildlife, which is heightened by EPA's broad invitation to regulated industries to suspend such activities without any public disclosure.

3.     Conservation Groups understand that COVID-19 presents unique challenges and that certain measures may be necessary to protect individuals involved in implementing programs under EPA's jurisdiction. However, this does not mean that EPA may simply ignore its vitally important, and legally required, ESA Section 7 duties and disregard potential impacts on imperiled species and their critical habitats. Section 7 consultation is the heart of the ESA and is vital to ensure that imperiled species are not jeopardized by fully evaluating and averting or mitigating harm.

4.     There can be no doubt that EPA's Non-Enforcement Policy triggers the agency's Section 7 consultation obligations. Defendants have taken a discretionary action that effectively authorizes regulated entities to forego actions that are required by law, including routine compliance monitoring, integrity testing, sampling, lab analysis, and reporting or certification requirements where the affected companies and municipalities maintain that such actions are not reasonably practicable due to COVID-19. EPA's policy implicates permits that limit pollution to protect the environment, including for listed species; therefore, the policy "may affect" listed species—the low threshold for triggering the Section 7 consultation requirements—by allowing unchecked pollution in habitats that listed species rely on, placing endangered and threatened species at risk. Section 7 consultation on the EPA Non-Enforcement Policy is thus required by the plain language of the ESA. 16 U.S.C. § 1536(a)(2).

5.      EPA has failed, however, to undertake any Section 7 consultation with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service (the "Services") on the Non-Enforcement Policy. EPA failed even to follow the Services' emergency consultation process, which allows agencies to take immediate action without first going through formal consultation in the event of an emergency, but still requires the agencies to notify the Services and complete formal consultation once the emergency is over.

6.      EPA did not notify and seek advice from the Services when it instituted the Non-Enforcement Policy, and it has not indicated any plans to undertake the required formal consultation, even once the policy is rescinded. Further, since there is no obligation within the Non-Enforcement Policy for regulated entities to "catch-up" with certain missed monitoring or reporting during the period that the policy will be in effect, absent such consultation there will be no way for EPA to ensure that its actions have not jeopardized listed species or critical habitat, as the ESA requires.

7.      According to a memorandum issued by EPA on June 29, 2020, the Non-Enforcement Policy is scheduled to terminate on August 31, 2020. However, there is no assurance that the policy will be rescinded by that date, particularly given the recent surge in COVID-19 cases. Regardless, EPA has failed to initiate any ESA Section 7 consultation to ensure that missed monitoring and reporting requirements and non-enforcement of important legal obligations pursuant to the Non-Enforcement Policy will not jeopardize listed species, in direct violation of EPA's mandatory duties under the ESA.

8.      Conservation Groups therefore bring suit to declare that EPA is in violation of Section 7 of the ESA and to compel EPA to complete formal consultation regarding the impacts of the Non-Enforcement Policy on listed species by a date certain, in order to ensure that EPA's

suspension of monitoring and reporting obligations has not and will not jeopardize listed species, or adversely modify or destroy the critical habitat of such species, and to enjoin any further reliance on the policy.

## JURISDICTION AND VENUE

9.      This court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) and (g) (actions arising under the ESA citizen suit provision); 5 U.S.C. § 702 (review of agency action under the Administrative Procedure Act ("APA")); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1346 (action against the United States); and 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty). The court may grant the relief requested under the ESA, 16 U.S.C. § 1540(g), the APA, 5 U.S.C. §§ 701–706, and 28 U.S.C. § 2201-02 (declaratory and injunctive relief).

10.     By written notice to Defendants dated April 21, 2020, Plaintiff Center for Biological Diversity provided notice of its intent to file suit, as required by the ESA. 16 U.S.C. § 1540(g). Further, by written notice to Defendants dated June 10, 2020, Plaintiffs Center for Biological Diversity, Waterkeeper Alliance, Inc., and Riverkeeper, Inc. provided supplemental notice of their intent to file suit more than sixty days prior to filing of this complaint, as required by the ESA. *Id.*

11.     Plaintiffs' notice letters demanded that Defendants advise the Conservation Groups of what steps were being taken to satisfy their obligations and comply with ESA Section 7 consultation requirements regarding the Non-Enforcement Policy.

12.     Plaintiffs' notice letters also demanded that Defendants clarify what actions will be taken to ensure that listed species and their critical habitat have not been and will not be jeopardized by Defendant's suspension of monitoring, reporting, and enforcement during the COVID-19 pandemic.

13.     Defendants have failed to respond or remedy the alleged violations, and therefore an actual, justiciable controversy exists within the meaning of 28 U.S.C. § 2201(a).

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(e), as a substantial part of the events or omissions giving rise to the claim occurred in this District, two of the Defendants have offices in this District, and Plaintiffs Waterkeeper Alliance, Inc., and Riverkeeper, Inc., reside or maintain their principal places of business within the Southern District of New York.

## PARTIES

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit conservation organization headquartered in Tucson, Arizona, with offices and members throughout the United States and Mexico, including members in New York. Through science, policy, law, and creative media, the Center works to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 74,000 members throughout the United States and the world. The Center and its members are concerned with, and have concrete interests in, the conservation of imperiled species and the effective implementation of the ESA. The Center's members have professional, aesthetic, spiritual, and/or recreational interests in imperiled species and are similarly interested in the health of these species' habitat. These members include those who have studied, viewed, photographed, and otherwise appreciated threatened and endangered species that may be affected by the EPA's Non-Enforcement Policy; those who live near these species, habitats, and ecosystems; and those who intend to visit and enjoy these species, habitats and ecosystems in the future.

16.     Plaintiff WATERKEEPER ALLIANCE, INC. ("Waterkeeper") is a not-for-profit corporation organized under the laws of New York. Waterkeeper is a member-supported, international environmental advocacy organization with its headquarters in New York. Waterkeeper strengthens and grows a global network of grassroots leaders protecting everyone's right to clean water. Comprised of more than 350 member and affiliate organizations around the world (including Plaintiff Riverkeeper, Inc.), as well as more than 12,000 individual supporting members, Waterkeeper is the largest and fastest growing non-profit focused solely on clean water. Waterkeeper's goal is drinkable, swimmable, and fishable water everywhere. Under its Clean

5

Water Defense campaign, Waterkeeper fights attempts to weaken current environmental laws and regulations, such as the Clean Water Act and the ESA, while promoting stronger legal safeguards for the world's water resources on behalf of Waterkeeper's member and affiliate organizations and all of our respective individual members. Waterkeeper holds polluters accountable and advocates for vigilant enforcement of environmental laws.

17.     Plaintiff RIVERKEEPER, INC. ("Riverkeeper") is a not-for-profit environmental organization existing under the laws of the state of New York, headquartered in Ossining, New York. Formed in 1966 as the Hudson River Fishermen's Association, Riverkeeper's mission includes safeguarding the environmental, recreational, and commercial integrity of the Hudson River, its tributaries, and the waters of New York City. Riverkeeper and its 3,807 members work to restore and protect the Hudson River Estuary habitat for both the federally listed endangered shortnose sturgeon and the Atlantic sturgeon-New York Bight Distinct Population Segment, which have been listed by the National Marine Fisheries Service as endangered species.

18.     Plaintiffs' members and staff have researched, studied, observed, and sought protection for endangered species that are adversely affected by the suspension of monitoring and reporting obligations directed by EPA-issued permits. Furthermore, Plaintiffs' members and staff have visited and observed or sought out threatened and endangered species that are imperiled by the non-enforcement of EPA permits and the suspension of various effluent sampling programs. Plaintiffs' members and staff intend to continue to visit and observe, or attempt to visit and observe, these species in the near future.

19.     Notwithstanding that information on specific regulated entities that have not complied with monitoring and reporting requirements due to COVID-19 is constrained by the limited data EPA has made public on waivers under the Non-Enforcement Policy, and that the information that has been made publicly available does not specify impacts to listed species—thus reinforcing the need for ESA Section 7 consultation—Plaintiffs have obtained data regarding several specific regulated entities that have sought waivers for compliance with Clean Water Act permitting obligations under the Non-Enforcement Policy for commercial and industrial

6

operations where listed species are present and may be adversely affected by the suspension of monitoring, reporting, and enforcement resulting from the Non-Enforcement Policy.

20.     For example, Plaintiffs have learned of waivers under the Non-Enforcement Policy for compliance with permits—including for organic chemicals manufacturing, sewage discharge and water pollution control facilities—where increased pollution output poses risks to listed species, including critically endangered Atlantic and shortnose sturgeon in the Delaware and Connecticut Rivers. The Plaintiff organizations have a long history of taking action to protect these imperiled sturgeon, including through litigation to limit and prevent pollution that degrades their habitat (indeed, Waterkeeper is so committed to protecting sturgeon that it made the sturgeon its logo). Plaintiffs have members that enjoy and study listed sturgeon, including at least one member who is a fish biologist and professor that has published articles on sturgeon with a focus on population dynamics, abundance, distribution, and recruitment of sturgeon, including how they are affected by anthropogenic pollution. This member has spent much of his professional life studying sturgeon and plans on continuing to study these species and write books and articles about them. Any degradation of essential sturgeon habitat associated with the suspension of monitoring, reporting, and enforcement requirements hampers this member's ability to undertake research in the future, thereby harming his academic and aesthetic interests, as well as the Conservation Groups' interests in protecting these sturgeon species.

21.     Plaintiffs' members and staff derive scientific, recreational, spiritual, and aesthetic benefits from imperiled species' existence in the wild, and their interest in maintaining the species inhabiting the forests and rivers of areas monitored and reported through EPA-issued permits and programs is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems and populations. Any activities that "may affect" or destroy, degrade, or diminish these areas, or that kill, injure, harm, harass, or displace populations of listed species, interfere with Plaintiffs' staff and members' use and enjoyment of the areas and species.

22.     Plaintiffs' members and staff include scientists who study various threatened and endangered species, and whose interests in studying and enjoying these species and their habitats

are entirely dependent on the continued existence of such species. Any action that interferes with and harms these species also harms those members' interests and enjoyment in studying those species. Any loss of individuals or habitat would hamper their ability to undertake such research in the future, thereby harming their academic and aesthetic interests in those species.

23.     EPA's suspension of monitoring and reporting requirements pursuant to the Non-Enforcement Policy directly and irreparably injures Plaintiffs' interests. EPA's failure to comply with the requirements of the ESA and APA delays, avoids, and undermines protections that are necessary to secure Plaintiffs' interests in the existence of listed species and their critical habitat.

24.     Plaintiffs have also suffered procedural injuries from Defendants' violations of the ESA in issuing the Non-Enforcement Policy without full and adequate analysis of the impacts to listed species through Section 7 consultation. These injuries are connected to Plaintiffs' substantive recreational, scientific, spiritual, and aesthetic interests. Plaintiffs' members and staff rely on Defendants to comply with the requirements of the ESA and prepare adequate environmental analyses as required by the statute. Plaintiffs rely on these analyses to achieve their organizational purposes, including monitoring the impacts of permitting obligations on listed species habitats; monitoring legal compliance concerning species' management; educating members, directors, staff, and the public concerning species management and the state of the environment; and advocating for policies that protect habitat and wildlife.

25.     Plaintiffs are also injured through impairment of their fundamental missions to protect the environment and imperiled species, and diversion of resources from other critical tasks that would not have been necessary absent EPA's actions. Defendants' failure to comply with Section 7 of the ESA has caused Plaintiffs to divert and expend resources and staff to learn about the effects of the Non-Enforcement Policy, including through making and reviewing Freedom of Information Act requests and examining hundreds of permits for which a waiver was sought under the policy in order to determine whether listed species may have been adversely affected by unmonitored pollution. Plaintiffs are non-profit conservation organizations with limited resources that can be dedicated to their core mission to protect species and the habitats they rely on.

Defendants' actions impede Plaintiffs' ability to carry out their missions, and directly undercuts decades of successful work by Plaintiffs to enforce environmental laws that protect listed species and the habitats they rely on. Defendants' actions have also stifled the flow of data on pollution discharge and environmental degradation that are vital to Plaintiffs' efforts to conserve and recover listed species and protect critical habitat. The Non-Enforcement Policy is therefore harming, and will continue to harm, the Conservation Groups by requiring them to divert their limited resources and personnel away from other activities in an attempt to fill the gap left by EPA's failure to ensure, through ESA Section 7 consultation, that listed species are not jeopardized by the lack of monitoring and reporting under the Non-Enforcement Policy.

26.     These are actual, concrete injuries to Plaintiffs, caused by EPA's failure to comply with the ESA and its implementing regulations. The interests and organizational purposes of Plaintiffs and their staff and members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief and orders Defendants to comply with the ESA, harm to protected species will continue to accrue, and the aesthetic, recreational, educational, professional, scientific, and spiritual, and conservation interests of Plaintiffs and their staff and members will continue to be adversely affected. The relief requested will directly redress those injuries.

27.     Defendant ANDREW WHEELER is the Administrator of the United States Environmental Protection Agency. He is sued only in his official capacity.

28.     Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is an agency of the federal government, charged with administering and enforcing permits under various environmental laws, including the Clean Water Act, Clean Air Act, and the Safe Drinking Water Act. EPA has a statutory responsibility under the ESA to ensure that any discretionary action it takes which "may affect" listed species is not likely to jeopardize the continued existence of any such species through Section 7 consultation.

## STATUTORY FRAMEWORK

**A.     The Endangered Species Act**

29.     With the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

30.     Under the ESA, conservation means "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3).

31.     The ESA assigns responsibility to implement the statute to the Secretaries of Commerce and Interior, which in turn have delegated responsibility to the National Marine Fisheries Service and the U.S. Fish and Wildlife Service, respectively. 50 C.F.R. § 402.01(b).

32.     To fulfill the substantive purposes of the ESA, federal agencies are required to engage in Section 7 consultation with the Services to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

33.     Section 7 consultation is required for "any action [that] may affect listed species or critical habitat." 50 C.F.R. § 402.14. Agency "action" is defined broadly in the ESA's implementing regulations to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," such as the promulgation of regulations, the granting of permits, or actions directly or indirectly causing modifications to the land, water, or air. *Id*. § 402.02.

34.     The duties in ESA Section 7 are only fulfilled by an agency's satisfaction of the consultation requirements that are set forth in the implementing regulations for Section 7 of the ESA, 50 C.F.R. §§ 402.10-402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward.

35.     Each federal agency must review its actions at "the earliest possible time" to determine whether any action "may affect" listed species or their critical habitat in the "action area." *Id.* § 402.14(a). The "action area" encompasses all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02. The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," and thus is easily triggered. *Interagency Cooperation – Endangered Species Act of 1973, As Amended*, 51 Fed. Reg. 19,926 (June 3, 1986).

36.     If an action agency concludes that the action is "likely to adversely affect" listed species or critical habitat, the agency must engage in "formal consultation" with the Service(s) to meet the ESA's substantive "no jeopardy" mandate. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

37.     Formal ESA consultation commences with the action agency's written request for consultation and concludes with Services' issuance of a "biological opinion." 50 C.F.R. § 402.14(g)(4).

38.     During formal consultation, the Service(s) and the action agency must evaluate the "effects of the action," including all direct and indirect effects of the proposed action, plus the effects of actions that are interrelated or interdependent, added to all existing environmental conditions—that is, the "environmental baseline." *Id.* § 402.02. The environmental baseline includes the "past and present impacts of all Federal, State, or private actions and other human activities in the action area . . . ." *Id.* The effects of the action must be considered together with "cumulative effects," which are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

39.     The biological opinion states the Service(s)' opinion as to whether the effects of the action are "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id.* § 402.14(g)(4). To "jeopardize the continued existence of" means "to engage in an action that reasonably would be expected, directly

or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." *Id*. § 402.02. The determination of whether an activity is likely to jeopardize the continued existence of a species must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and the Service(s) must use the best available science in formulating the biological opinion and approving incidental take through formal consultation. 50 C.F.R. § 402.14(g)(8).

40.     If the Services determine that the action is likely to jeopardize a species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy and "which [the agency] believes would not violate [Section 7(a)(2)]." 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). The Services may also "suggest modifications" to the action during the course of consultation to "avoid the likelihood of adverse effects" to the listed species even when not necessary to avoid jeopardy. 50 C.F.R. § 402.13(b).

41.     Conversely, pursuant to Section 7(b)(4) of the ESA, a biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species must include an "incidental take statement" ("ITS"), which must specify the impact of any allowable take of individual members of the species, provide reasonable and prudent measures ("RPMs") necessary to minimize the impact of that take, and set forth terms and conditions that must be followed to implement such measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1), (3).

42.     The ESA requires the Services to conclude the formal consultation process within 90 days of the date the consultation was initiated unless the Services and the action agency agree to extend the consultation for a specific time period. 16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.14(e). The Section 7 consultation process *must* be completed prior to the agency undertaking any action that would adversely affect listed species or critical habitat. *See* 16 U.S.C. § 1536(d) (stating that pending completion of consultation, the applicant and Federal agency "*shall* not

make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" to prevent jeopardy).

43.     Pursuant to the ESA implementing regulations at 50 C.F.R. § 402.05 and the Services' Endangered Species Consultation Handbook, in the event of an emergency (*i.e.* natural disaster or other calamity) where the response "may affect" listed species but requires the agency to take immediate action without first going through formal consultation, the agency must notify the Services and seek advice to minimize the effects of the emergency response, and then initiate formal consultation after the emergency is over to document impacts and establish measures to mitigate such impacts to listed species.

44.     After the issuance of a biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency and the Services must reinitiate formal consultation if, *inter alia*, "[t]he amount or extent of taking specified in the incidental take statement is exceeded; new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; the identified action is subsequently modified in a manner that causes an effect to the listed species . . . that was not considered in the biological opinion; or a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

**B.     The Administrative Procedure Act**

45.     The APA provides the standard of review for ESA citizen suit claims. Under the APA, courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2). The APA also allows courts to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

## FACTUAL AND REGULATORY BACKGROUND

**A.      EPA's March 26, 2020 Non-Enforcement Policy**

46.     On March 26, 2020, EPA issued a Memorandum entitled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program," which set forth a policy regarding compliance and enforcement of environmental legal obligations of regulated entities during and until the end of the COVID-19 pandemic. While the Non-Enforcement Policy does not specify an end date, EPA has since issued a memorandum indicating it intends to rescind the policy on August 31, 2020.

47.     This discretionary action allows regulated entities to forego certain routine compliance obligations, including monitoring, integrity testing, sampling, lab analysis, training, and reporting or certification where companies assert that such actions are not "reasonably practicable" due to COVID-19. It requires the regulated entities to "act responsibly" in order to minimize the effects of such noncompliance; to document the specific nature and dates of the noncompliance; to identify how COVID-19 was the cause of such noncompliance; and to return to compliance as soon as possible.

48.     The Non-Enforcement Policy applies to obligations under various environmental laws, including the Clean Water Act, Clean Air Act, Safe Drinking Water Act, Resource Conservation and Recovery Act, and Emergency Planning and Community Right-to-Know Act. These vitally important environmental laws create essential protections for listed species and critical habitats.

49.     The terms and conditions of the Non-Enforcement Policy do not provide any reference to the ESA or compliance with EPA's Section 7 duties. Based on the information

14

available to the public, EPA has not, and does not intend to, undertake any ESA consultation on the Non-Enforcement Policy. In response to FOIA requests, the Services have confirmed that EPA did not discuss the policy with the wildlife agencies or initiate any form of Section 7 consultation.

50.     While EPA has not included within its Non-Enforcement Policy any indication that even emergency Section 7 consultation procedures will be implemented, other federal agencies, such as FEMA, have engaged in such emergency consultation during their COVID-19 responses.

51.     The Non-Enforcement Policy provides discretion for regulated entities to determine whether monitoring and reporting under EPA-issued permits is "reasonably practicable" during the pandemic, without any requirement that EPA ensure that compliance was indeed impracticable, though supporting documentation must be provided to EPA upon request. Even if the avoidance of compliance with environmental laws is reasonable given the circumstances of the pandemic and resulting increases in pollution is not purposeful, the Non-Enforcement Policy fails to ensure that tabs are kept on pollution that may harm listed species.

**B.     Impacts to Listed Species from Suspension of Monitoring and Reporting Requirements**

52.     The suspension of monitoring and reporting requirements where such activities are not reasonably practicable due to COVID-19, and EPA's assertion in the Non-Enforcement Policy that it does not expect to seek penalties if regulated entities are unable to comply with various environmental legal obligations due to the pandemic, has the potential to result in adverse impacts to listed species.

53.     A June 22, 2020 study on the impacts of the Non-Enforcement Policy by the School of Public Affairs at American University entitled "The Effects of Increased Pollution on COVID-19 Cases and Deaths," found that EPA's rollback of environmental enforcement has

caused an increase in pollution because regulated entities respond in the absence of regulatory incentives by increasing pollution output. Other peer-reviewed literature confirms that nonenforcement and waivers of monitoring responsibilities reduces regulated entities' environmental compliance and increases total pollution.

54.     The regulatory programs affected by the EPA Non-Enforcement Policy expressly implicate interests to listed wildlife species and the habitat they rely on. These regulatory programs, particularly those under the Clean Air Act and Clean Water Act, are intended to limit pollution and prevent adverse environmental harm, including to listed species and their habitat.

55.     For example, the Clean Water Act's National Pollutant Discharge Elimination System ("NPDES") effluent sampling program often includes monitoring requirements specifically intended to protect listed species and the habitats of these species.

56.     NPDES permits are required to contain limitations to reflect the application of available treatment technologies, as well as any more stringent limitations needed to ensure compliance with water quality standards. Water quality standards are intended to protect the condition of a water body to ensure that its designated uses remain available (which often includes use as habitat for species) and contain an antidegradation policy to protect existing uses and provide a mechanism for maintaining high water quality, which is essential to ensuring the ongoing availability of suitable habitat for many listed species. Therefore, suspension of the NPDES effluent sampling program potentially affects listed species and critical habitats by allowing unmonitored and unreported (and hence unrestricted) contamination of waterways such species depend on (*i.e.* increased levels of chemicals, suspended sediment, or temperature variations).

57.     Because EPA's issuance of NPDES permits has the potential to harm endangered and threatened species, EPA must engage in Section 7 consultation before it issues such permits and must reinitiate consultation in the event that changed circumstances or new information reflect threats to species that were not previously considered. *See* 50 C.F.R. § 402.16. This highlights the potential for harm to listed species from EPA's suspension of Clean Water Act monitoring and reporting requirements.

58.     EPA has provided a partial list of NPDES permits for which regulated entities sought a waiver under the Non-Enforcement Policy. That list, which only includes waivers as of July 7, 2020, contains over 350 NPDES permits where monitoring and reporting requirements were not complied with, purportedly due to COVID-19. Several of these NPDES permits implicate adverse impacts to listed species, including waivers for wastewater treatment plants, organic chemicals manufacturing, and other commercial and industrial activities where the receiving waters are relied upon by listed species.

**C.     EPA's Failure to Consult on the Non-Enforcement Policy**

59.      Although it is readily apparent that EPA's Non-Enforcement Policy "may affect" listed species and their critical habitat, EPA has not initiated any ESA Section 7 consultation with the Services on the Non-Enforcement Policy.

60.     EPA has failed to even follow the Services' emergency consultation process as set forth in the Services' Endangered Species Consultation Handbook. EPA has not contacted the Services to discuss the suspension of monitoring and reporting requirements to see what steps can be taken to protect species while the Non-Enforcement Policy is in effect, and has not shown any indication that it intends to initiate consultation once the Non-Enforcement Policy is rescinded, including in the June 29, 2020 Memo expressing EPA's intent to rescind the Non-Enforcement Policy on August 31, 2020.

61.     Nor does the Non-Enforcement Policy suggest that the agency intends to gather the necessary information once the policy is revoked to initiate formal consultation after the emergency has passed. To the contrary, the policy specifically states that "EPA does not plan to ask facilities to 'catch up' with missed monitoring or reporting. . . ."

62.     EPA has not made available any other documents that explain how the Non-Enforcement Policy will comply with the Services' emergency consultation procedures or otherwise fulfill the agency's ESA Section 7 duties.

## FIRST CLAIM FOR RELIEF

### Violation of the Endangered Species Act Section 7(a)(2), 16 U.S.C. § 1536(a)(2)
### (Failure to Complete ESA Section 7 Consultation for COVID-19 Non-Enforcement Policy.)

63.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

64.     Defendants have an ongoing duty pursuant to ESA Section 7(a)(2) to ensure that their actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat. 16 U.S.C. § 1536(a)(2).

65.     Suspension of monitoring and reporting requirements through the Non-Enforcement Policy poses distinct threats to species affected by EPA-issued permits, and thus, the Policy clearly meets the ESA's "may affect" threshold for triggering the agency's Section 7 consultation obligations.

66.     EPA failed to undertake any ESA Section 7 consultation on the Non-Enforcement Policy. Even if EPA believes the Non-Enforcement Policy is necessary to respond to an ongoing emergency, that does not excuse total non-compliance with Section 7 requirements. Rather, there are specific steps that EPA must take to ensure compliance with Section 7, and yet, there is no evidence that EPA has followed the emergency consultation procedures.

67.     Defendants' failure to enter into and complete formal consultation with the Services regarding the effects of the Non-Enforcement Policy on listed species and their critical habitats constitutes a failure to ensure that their actions are not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in direct violation of Section 7 of the ESA, 16 U.S.C. § 1536. Such action is arbitrary and capricious within the meaning of the APA, and in direct violation of Defendants' duties pursuant to the ESA.

## SECOND CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1) (Failure to initiate consultation on the Non-Enforcement Policy constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of the APA)**

68.     Plaintiffs re-allege and incorporate by reference, as if fully set forth herein, each and every allegation in the preceding paragraphs of this Complaint.

69.     Defendants have a duty pursuant to ESA Section 7(a)(2) to ensure that the Non-Enforcement Policy is not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat through Section 7 consultation. 16 U.S.C. § 1536(a)(2).

70.     The Section 7 consultation process must be initiated at "the earliest possible time" for any project that "may affect" listed species. 50 C.F.R. § 402.14(a). Normally, such consultation must be completed *before* an agency action takes place. However, for emergency consultations, the consultation process is initiated through communications with the Services when the action agency undertakes an emergency response action that "may affect" listed species, and then the formal consultation process is undertaken once the emergency is over.

71.     As set forth above, EPA's Non-Enforcement Policy poses distinct threats to species affected by EPA-issued permits, and thus meets the ESA's low "may affect" threshold for triggering the agency's Section 7 consultation obligations.

72.     The Defendants' failure to initiate any form of Section 7 consultation on the Non-Enforcement Policy at the "earliest possible time" or to even contact the Services to initiate the

emergency consultation process constitutes agency action that has been "unlawfully withheld or unreasonably delayed" in violation of the APA, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

A.     Declare that Defendants violated the APA and the ESA and its implementing regulations by failing to ensure through formal ESA consultation that the Non-Enforcement Policy will not jeopardize the continued existence of threatened or endangered species, or destroy or adversely modify such species' critical habitats, and enjoin any further reliance on the policy;

B.     Compel Defendants to complete formal ESA consultation on the Non-Enforcement Policy with the National Marine Fisheries Service and the U.S. Fish and Wildlife Service by a date certain;

C.     Award Plaintiffs reasonable costs and attorneys' fees under the ESA, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D.     Grant Plaintiffs such other relief as the Court deems just and equitable.

DATE: August 18, 2020                          Respectfully Submitted,

*/s/ Todd D. Ommen*
Todd D. Ommen (TO-1340)
Pace Environmental Litigation Clinic, Inc.
78 North Broadway, White Plains, NY 10603
tommen@law.pace.edu
(914) 422-4343
*Attorneys for Plaintiffs Waterkeeper Alliance, Inc., and Riverkeeper, Inc.*

*Jared M. Margolis (OR Bar No. 146145,* SDNY *pro hac application to be filed)*
*CENTER FOR BIOLOGICAL DIVERSITY*
*2852 Willamette St. # 171*
*Eugene, OR 97405*
*Phone: (802) 310-4054*
*Email: jmargolis@biologicaldiversity.org*
*Attorney for Plaintiff Center for Biological Diversity*

Of Counsel:   Daniel E. Estrin (DE-3085)   Richard Webster
                  *Waterkeeper Alliance, Inc.*   *Riverkeeper, Inc.*