**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WATERKEEPER ALLIANCE, INC., and RIVERKEEPER, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency, <br><br> Defendants. | Case No. 1:20-cv-06572 (JSR) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION .................................................................................................................... 1

LEGAL FRAMEWORK ........................................................................................................... 3

    I.   ENDANGERED SPECIES ACT ................................................................................. 3

    II.  ADMINISTRATIVE PROCEDURE ACT .................................................................. 6

STATEMENT OF FACTS ........................................................................................................ 6

STANDARD OF REVIEW ....................................................................................................... 12

ARGUMENT ........................................................................................................................... 12

    I.   EPA FAILED TO INITIATE AND COMPLETE ESA SECTION 7
          CONSULTATION ON THE NON-ENFORCEMENT POLICY IN
          VIOLATION OF THE ESA .................................................................................... 12

          A.   EPA's Policy is an Agency Action That "May Affect" Listed
              Species and Their Critical Habitats Requiring Section 7
              Consultation ........................................................................................ 13

          B.   EPA Failed to Even Follow the Service's Emergency Consultation
              Process ................................................................................................ 18

    II.  EPA'S FAILURE TO CONSULT CONSTITUTES AN AGENCY ACTION
          UNLAWFULLY WITHHELD IN VIOLATION OF THE APA ................................. 20

REMEDY ................................................................................................................................. 21

CONCLUSION ........................................................................................................................ 21

**TABLE OF AUTHORITIES**

## CASES

*Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175. F.3d 1156 (9th Cir. 1999) ...................................................................................................6

*Bernstein/Glazer, LLC v. Babbitt*, No. 99 Civ. 1195, 2000 WL 322778 (S.D.N.Y. March 28, 2000) ...............................................................................................6, 12

*City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860 (S.D.N.Y. 2017)...................................................................................................................12

*Cottonwood Envtl. Law Ctr. v. United States Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015)...................................................................................................................19

*Forest Guardians v. Babbitt*, 174 F.3d 1178 (10th Cir. 1999) .................................6

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) .... 4, 14, 17

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014).......4, 16

*National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ..19

*NRDC v. Muszynski*, 268 F.3d 91 (2d Cir. 2001) ....................................................6

*NRDC, Inc. v. Fox*, 93 F. Supp. 2d 531 (S.D.N.Y. 2000)...................................6, 21

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987) ............................................18

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978)..................................................2, 18

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) .............3, 17

## STATUTES

16 U.S.C. § 1531 ........................................................................................................3

16 U.S.C. § 1536........................................................ 1, 3, 4, 12, 13, 14, 18, 20, 21

33 U.S.C. § 1311 ........................................................................................................8

5 U.S.C. § 706.................................................................................................. 6, 12, 20

Fed. R. Civ. P. 56(a)................................................................................................12

## OTHER AUTHORITIES

40 C.F.R. § 131.12 ...............................................................................................9

40 C.F.R. § 131.2 ................................................................................................8

50 C.F.R. § 402.02 ..................................................................................... 3, 4, 14

50 C.F.R. § 402.05 ...............................................................................................5

50 C.F.R. § 402.12 ...............................................................................................4

50 C.F.R. § 402.13 ...............................................................................................4

50 C.F.R. § 402.14 ......................................................................................... 2, 3, 4

50 C.F.R. § 402.16 .............................................................................................15

## RULES

51 Fed. Reg. 19,926 ......................................................................................4, 17

ENDANGERED SPECIES CONSULTATION HANDBOOK ............................................5, 18

## INTRODUCTION

Plaintiffs challenge the U.S. Environmental Protection Agency's ("EPA") total failure to comply with the Endangered Species Act ("ESA") regarding EPA's decision to suspend myriad environmental legal obligations in light of the COVID-19 pandemic.[1] On March 26, 2020, EPA issued a memorandum entitled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program," that established an unprecedented policy whereby EPA voluntarily suspended the enforcement of environmental legal obligations under various regulatory programs, such as the Clean Air Act and Clean Water Act, for all industries during the pandemic (the "Policy"). Pls.' Rule 56.1 Statement ¶ 1. As a result, many of the key pollution reduction pillars elemental to federal environmental law – including monitoring, reporting, and enforcement – were relaxed or arrested altogether, leading thousands of industrial polluters to bypass their environmental compliance obligations. In easing regulatory programs that are intended to limit pollution and prevent adverse environmental harm, the Policy certainly harms endangered species by increasing the probability of exposure to harmful pollution and further degrading habitats critical to their survival. *See* 16 U.S.C. § 1536(a)(2) (2018). EPA, however failed entirely to consult at all with the U.S. Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS") (collectively the "Services") on the Policy, in violation of the ESA.

The duty to prevent jeopardy—actions that will reduce an ESA-protected species ability to survive and recover in the wild—in consultation with the Services is one of the ESA's cornerstones for the conservation of imperiled species. In order to effectuate the substantive

---

[1] The facts underlying this motion are set forth in Plaintiffs' Rule 56.1 Statement of Undisputed Facts. ("Rule 56.1 Statement").

protections of the ESA, agencies *must* follow a detailed consultation process for *any* agency action that "may affect" protected species. 50 C.F.R. § 402.14 (2020). Here, however, though there is no doubt that the EPA Policy meets the low "may affect" threshold for consultation, EPA has refused to consult with the Services, and even failed to comply with the Services' long-established emergency consultation process. This wanton disregard for the process mandated by Congress to address the adverse effects of EPA's actions on imperiled species ignores not only the plain language of the ESA and implementing regulations, but clear Congressional intent that listed species be afforded the "highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

While Plaintiffs of course recognize that certain steps may be appropriate to protect people from harm during the pandemic, that does not give license to EPA to simply ignore its vitally important ESA duties and disregard impacts to imperiled species and their critical habitats by allowing unrestricted contamination of habitats on which such species depend. Suspension of monitoring, reporting, and enforcement of environmental legal obligations under the Policy creates an immediate and serious risk to imperiled wildlife. The EPA's refusal to address these impacts through ESA consultation sets a dangerous precedent for the abdication of core ESA duties.

In sum, EPA's failure to ensure through ESA Section 7 consultation that the Policy will not jeopardize listed species and impair their critical habitats is arbitrary and capricious agency action, in patent violation of Section 7 of the ESA. EPA's failure to comply with the ESA consultation requirements also constitutes agency action unlawfully withheld in violation of Section 706(1) of the Administrative Procedure Act ("APA"). Accordingly, the Court should grant Plaintiffs' motion for summary judgment.

## LEGAL FRAMEWORK

## I.    ENDANGERED SPECIES ACT

Congress enacted the ESA in 1973 in order to conserve endangered and threatened species and the habitats they rely on. 16 U.S.C. § 1531(b) (2018). In enacting the ESA, Congress found that "various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untampered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). To stem the extinction crisis, Congress created ESA Section 7, a vital safeguard that requires each federal agency, in consultation with FWS and/or NMFS, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2).

The duty to prevent jeopardy is one of the ESA's fundamental pillars for the conservation of imperiled species. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011) (describing Section 7 consultation as the "heart of the ESA"). To comply with this duty, Section 7(a)(2) and its implementing regulations set forth a detailed consultation process that must be followed before agencies take actions that "may affect" listed species. Agency "action" is defined broadly to include, *inter alia*, all "actions directly or indirectly causing modifications to the land, water, or air," 50 C.F.R. § 402.02 (2020), and the consultation obligation applies to "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" that "may affect" listed species or critical habitat in any manner. *Id.* § 402.14.

As set forth in the ESA Section 7 implementing regulations, Federal agencies must review their actions at "the earliest possible time" to determine whether any action "may affect" listed species or their critical habitat in the "action area." *Id.* § 402.14(a). The "action area"

encompasses all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02. The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," *Id.* § 402.14(a)*,* and thus the consultation requirement is "easily triggered." Interagency Cooperation – Endangered Species Act of 1973, As Amended, 51 Fed. Reg. 19,926, 19,949-50 (June 3, 1986); *see also Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 13 (D.D.C. 2014) ("The 'may affect' threshold for triggering the consultation duty under section 7(a)(2) is low.") (citing *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).

Pursuant to the Section 7 consultation process, if listed species may be present in the action area, the agency must prepare a "biological assessment" that "evaluate[s] the potential effects of the action" on listed species and their habitat. 50 C.F.R. §§ 402.02, 402.12 (2020). If the action agency concludes in its biological assessment that an action is "not likely to adversely affect" listed species, and the Services concur with that determination in writing, the action agency typically relies on the biological assessment and concurrence (known as "informal consultation") to satisfy its ESA obligations. *See id.* §§ 402.13(a) (2020), 402.14(a)-(b). However, if an action agency determines in its biological assessment that an action "may affect" and is "likely to adversely affect" listed species or critical habitat, the agency must enter into a more extensive consultation process with the Services, known as "formal consultation." *See* 50 C.F.R. §§ 402.14(a)-(b), 402.12(k).

The ESA requires the Section 7 consultation process to be completed prior to the agency undertaking any action that would adversely affect listed species or critical habitat. *See* 16 U.S.C. § 1536(d) (stating that pending completion of consultation, the applicant and Federal agency

"shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" to prevent jeopardy).

The Services have also provided an alternative consultation process in the case of "emergencies." In an emergency, such as "situations involving acts of God, disasters, casualties, national defense or security emergencies, etc.," 50 C.F.R. § 402.05(a) (2020), initial consultation may be conducted informally through alternative procedures that are consistent with Section 7 of the ESA (*i.e.* by calling or emailing the Services to discuss the emergency action and any prudent mitigation), *id.*, and then "[f]ormal consultation shall be initiated as soon as practicable after the emergency is under control." *Id.* § 402.05(b).

The Services have expounded on the emergency consultation process in their ENDANGERED SPECIES CONSULTATION HANDBOOK 8-1 to 8-5 (1998), https://www.fws.gov /endangered/esa-library/pdf/esa_section7_handbook.pdf ("Handbook"). The Handbook explains that in the initial stages of emergency consultation, the Services "offer recommendations to minimize the effects of the emergency response action on listed species or their critical habitat," and then a full, formal consultation is to take place after the emergency is under control. *Id.* The emergency formal consultation "is treated like any other formal consultation." *Id.* However, post-emergency consultations require the agency to provide additional information, including "an evaluation of the response to and the impacts of the emergency on affected species and their habitats, including documentation of how the Services' recommendations were implemented, and the results of implementation in minimizing take." *Id.*

## II.   ADMINISTRATIVE PROCEDURE ACT

Since the ESA does not specify a standard of review, ESA citizen suit claims are reviewed under the standard set forth in the APA, which provides that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as well as agency action adopted "without observance of procedure required by law." 5 U.S.C. § 706(2) (2018); *see also Bernstein/Glazer, LLC v. Babbitt*, No. 99 Civ. 1195, 2000 WL 322778, at *14–15 (S.D.N.Y. March 28, 2000) (citing *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1186 (10th Cir. 1999); *Aluminum Co. of Am. v. Administrator, Bonneville Power Admin.*, 175. F.3d 1156, 1160 (9th Cir. 1999)).

The APA also allows courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "An agency action . . . is 'unlawfully withheld' when an agency fails to meet a clear deadline prescribed by Congress." *NRDC, Inc. v. Fox*, 93 F. Supp. 2d 531, 543 (S.D.N.Y. 2000) *aff'd in part, vacated in part on other grounds sub nom*, *NRDC v. Muszynski*, 268 F.3d 91 (2d Cir. 2001).

## STATEMENT OF FACTS

On March 26, 2020, EPA issued a memorandum entitled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." SUSAN PARKER BODINE, U.S. EPA, COVID-19 IMPLICATIONS FOR EPA'S ENFORCEMENT AND COMPLIANCE ASSURANCE PROGRAM 1 (2020), https://www.epa.gov/sites/production/files/2020-03/documents/oecamemooncovid19 implications.pdf [hereinafter "Policy Memorandum"]; Pls.' Rule 56.1 Statement ¶ 1. This memorandum established EPA's policy concerning compliance and enforcement of environmental legal obligations for regulated parties during the COVID-19 pandemic. Policy

Memorandum at 1; Pls.' Rule 56.1 Statement ¶ 1. The Policy was made retroactive to March 13, 2020. Policy Memorandum at 1; Pls.' Rule 56.1 Statement ¶ 2.

The EPA Policy applies to permit obligations under various environmental laws, including the Clean Water Act, Clean Air Act, Safe Drinking Water Act, Resource Conservation and Recovery Act, and Emergency Planning and Community Right-to-Know Act. Policy Memorandum at 2-6; Pls.' Rule 56.1 Statement ¶ 5. Pursuant to the Policy, EPA allowed regulated entities to forego certain permit obligations under these statutes, including routine compliance monitoring, integrity testing, sampling, lab analysis, training, and reporting or certification, where permittees assert that such actions were not "reasonably practicable" due to COVID-19. Policy Memorandum at 1-3; Pls.' Rule 56.1 Statement ¶ 6. The EPA also asserted that it would exercise enforcement discretion for noncompliance covered by the Policy, and not seek penalties for permittees' failure to fulfill legal obligations where permittees maintain that such compliance was hindered by COVID-19. Policy Memorandum at 1; Pls.' Rule 56.1 Statement ¶ 7.

Specifically, the EPA Policy recognized that the COVID-19 pandemic may affect "reporting obligations and milestones set forth in settlements and consent decrees . . . [and] may affect the ability of an operation to meet enforceable limitations on air emissions and water discharges, requirements for the management of hazardous waste, or requirements to ensure and provide safe drinking water." Policy Memorandum at 2; Pls.' Rule 56.1 Statement ¶ 8. The Policy states that EPA "expects all regulated entities to continue to manage and operate their facilities in a manner that is safe and that protects the public and the environment," but it does not require entities to do so or provide a means of ensuring safe operations. Policy Memorandum at 4; Pls.' Rule 56.1 Statement ¶ 9.

The Policy grants regulated entities discretion to determine whether COVID-19 has made it impracticable to comply with applicable environmental legal obligations and permit requirements. *See* Policy Memorandum at 3; Pls.' Rule 56.1 Statement ¶ 11. Indeed, the Policy contains no requirement that EPA ensure that compliance was indeed impracticable due to COVID-19, though it does state that regulated entities must provide supporting documentation upon request. *Id.* Furthermore, EPA did not require facilities to "catch-up" with missed monitoring or reporting requirements where such requirements apply to intervals of less than three months. Policy Memorandum at 3; Pls.' Rule 56.1 Statement ¶ 10.

EPA's suspension of environmental legal obligations, including monitoring and reporting requirements, creates an immediate and serious risk to imperiled wildlife. Hamel Decl. ¶ 14; Pls.' 56.1 Statement ¶ 37; Waldman Decl. ¶¶ 11–14; Pls.' 56.1 Statement ¶ 44–46.  These regulatory programs are intended to limit pollution and prevent adverse environmental harm, including to protected wildlife species and the habitats they rely on. For example, suspension of Clean Water Act ("CWA") National Pollution Discharge Elimination System ("NPDES") permit requirements may affect listed species by allowing unmonitored and unreported (and hence unrestricted) contamination of waterways listed species depend on, through increased levels of chemicals, suspended sediment, or temperature variations. Hamel Decl. ¶ 14; Pls.' 56.1 Statement ¶ 37; Waldman Decl. ¶¶ 11–14; Pls.' 56.1 Statement ¶ 45–46. NPDES permits are required to contain limitations to reflect the application of available treatment technologies to ensure compliance with water quality standards. *See* 33 U.S.C. § 1311(b) (2018) (effluent limitations); 40 C.F.R. § 131.2 (2020) (water quality standards). Water quality standards, in turn, are intended to protect the condition of the water body to ensure that its designated uses remain available, which often includes use as habitat for species. *Id.* ("water quality standards should, wherever attainable,

provide water quality for the protection and propagation of fish, shellfish, and wildlife . . . .").
And NPDES permits contain an antidegradation policy to protect existing uses and maintain high
water quality, *id.* § 131.12 (2020), which is essential to ensuring the ongoing availability of
suitable habitat for many listed species. *See id.* § 131.12(a)(1) ("The antidegradation policy shall
. . . protect the existing uses . . . ."). Consequently, EPA's suspension of NPDES monitoring and
reporting obligations poses distinct threats to listed species.

EPA has made public a partial list[2] of NPDES permits for which regulated entities sought
a waiver of compliance under the Non-Enforcement Policy. Ommen Decl. Ex. F; Pls.' Rule 56.1
Statement ¶ 16. That list—which only provides NPDES waiver requests as of July 7, 2020—
contains 350 NPDES permits where a waiver was sought, purportedly due to COVID-19.
Ommen Decl. Ex. F, at 1; Pls.' Rule 56.1 Statement ¶ 16. This list includes waivers requested
from wastewater treatment plants, organic chemicals manufacturing, and other commercial and
industrial activities, Ommen Decl. Ex. F, at 5–18; Pls.' Rule 56.1 Statement ¶ 16, several of
which impact waterways that are relied upon by listed species, including endangered Atlantic
and shortnose sturgeon. Pls.' Rule 56.1 Statement ¶ 17. For example, the list includes a water
pollution control facility in Massachusetts (Permit No. MA0101630), U.S. EPA, NPDES Permit
No. MA0101630 1 – City of Holyoke Water Pollution Control Facility (WPCF) (2009),
https://www3.epa.gov/region1/npdes/permits/2009/finalma0101630fs.pdf; Pls.' Rule 56.1
Statement ¶ 17, that discharges into receiving waters that provide habitat for endangered Atlantic
and shortnose sturgeon in the Connecticut River, *Surprise Catch: First Shortnose Sturgeon
Documented Above Dam in Connecticut River*, NOAA FISHERIES (Oct. 25, 2017),

---

[2] The list, Ommen Decl., Ex. F, Pls.' Rule 56.1 Statement ¶ 14, is exclusive to the NPDES
program and does not account for other polluters who sought waivers under other regulatory
programs implicated by the Policy. Policy Memorandum at 2-6; Pls.' Rule 56.1 Statement ¶ 5

https://www.fisheries.noaa.gov/feature-story/surprise-catch-first-shortnose-sturgeon-documented-above-dam-connecticut-river; Pls.' Rule 56.1 Statement ¶ 17, as well as an organic chemicals manufacturer in Connecticut (Permit No. CTP000004), U.S. EPA, NPDES Permit No. CTSP000004 2 – Bedoukian Research, Inc., Final Permit (2013), https://www3.epa.gov/region1/npdes/permits/2013/finalctsp0000004permit.pdf; Pls.' Rule 56.1 Statement ¶ 17, where the permit specifically states that "[t]he subject site is located within an area identified as a habitat for endangered, threatened, or special-concern species." *Id*.

Furthermore, studies have confirmed that pollution levels have increased due to EPA's Policy. Several months after the Policy's enactment, a study was released by the School of Public Affairs at American University. CLAUDIA L. PERSICO, KATHRYN R. JOHNSON, THE EFFECTS OF INCREASED POLLUTION ON COVID-19 CASES AND DEATHS (2020), https://www.eenews.net/assets/2020/07/17/document_gw_02.pdf; Pls.' 56.1 Statement ¶ 18. The study, titled "The Effects of Increased Pollution on COVID-19 Cases and Deaths," found, unsurprisingly, that EPA's rollback of environmental enforcement pursuant to the Policy resulted in increased pollution, and confirmed that regulated entities respond in the absence of regulatory incentives by increasing pollution output. *Id*.

However, the Policy makes no reference to impacts to listed species or compliance with the ESA. Policy Memorandum at 3; Pls.' 56.1 Statement ¶ 12. Moreover, EPA has stipulated that the agency "has not consulted with or requested emergency consultation with the U.S. Fish and Wildlife Service or the National Marine Fisheries Service under Section 7 of the Endangered Species Act and its implementing regulations regarding the Temporary Enforcement Policy. Ommen Decl. Ex. G; Pls.' 56.1 Statement ¶ 13. On information and belief, EPA never contacted the Services to discuss the potential impacts of the Policy on listed species, or measures to

mitigate such impacts. *Id.*; Ommen Decl. Exs. C, D, E; Pls.' 56.1 Statement ¶ 14 (EPA and Services had no responsive records to Plaintiffs' FOIA requests).

On June 29, 2020, EPA released an addendum to the March 26 memorandum stating that the Policy would expire on August 31, 2020, SUSAN PARKER BODINE, U.S. EPA, COVID-19 IMPLICATIONS FOR EPA'S ENFORCEMENT AND COMPLIANCE ASSURANCE PROGRAM: ADDENDUM ON TERMINATION 1 (2020), https://www.epa.gov/sites/production/files/2020-06/documents/ covid19addendumontermination.pdf; Pls.' 56.1 Statement ¶ 4, however, EPA has not released any further public statement confirming that it has rescinded the Policy, but EPA has updated its webpage regarding the Policy. U.S. EPA, *COVID-19 Enforcement and Compliance Resources*, https://www.epa.gov/enforcement/covid-19-enforcement-and-compliance-resources (last updated Sept. 21, 2020); Pls.' 56.1 Statement ¶ 4.

As required by the ESA's citizen suit provision, through two letters, Plaintiffs put EPA on formal notice that it was in violation of its mandatory duties under the ESA. Ommen Decl. Exs. A, B; Pls.' 56.1 Statement ¶ 15. Plaintiffs received no response to either letter. Pls.' 56.1 Statement ¶ 15. Accordingly, Plaintiffs filed this lawsuit challenging the EPA's failure to consult on the Policy as violating the ESA's nondiscretionary safeguards for avoiding the extinction of endangered and threatened species. Plaintiffs—a coalition of non-profit conservation groups— bring this lawsuit on behalf of their organizations and members, who are harmed by the EPA's failure to consult and whose injuries would be redressed if Plaintiffs' suit is successful. *See generally* Greenwald Decl., Hamel Decl., Dulong Decl., Waldman Decl., Estrin Decl.; Pls.' 56.1 Statement ¶¶ 20-63.

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Claims "brought under the ESA are reviewed according to the standards contained in the APA. Under these APA standards, a reviewing court may set aside agency actions only if they are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Bernstein/Glazer, LLC*, 2000 WL 322778, at *5; 5 U.S.C. § 706(2)(A). When a court reviews agency action(s) under the APA, "the question presented is a legal one which the district court can resolve . . . on a motion for summary judgment." *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 864 (S.D.N.Y. 2017) (quotation omitted).

## ARGUMENT

### I.  EPA FAILED TO INITIATE AND COMPLETE ESA SECTION 7 CONSULTATION ON THE NON-ENFORCEMENT POLICY IN VIOLATION OF THE ESA

Notwithstanding the unique challenges posed by the COVID-19 pandemic, EPA may not simply ignore its vitally important ESA Section 7 duties and thereby disregard potential impacts on imperiled species and their critical habitats. Indeed, even if EPA's Policy was entirely justified to respond to a public health emergency—a matter this Court need not resolve—that could not excuse EPA's complete disregard for ESA Section 7 because the ESA implementing regulations establish special consultation procedures for genuine emergencies. In any case, EPA has an affirmative duty pursuant to ESA Section 7(a)(2) to ensure that its actions are not likely to jeopardize the continued existence of endangered and threatened species or result in the destruction or adverse modification of such species' critical habitat through consultation with the Services. *See* 16 U.S.C. § 1536(a)(2) (2018). EPA failed to do so here.

There can be no doubt that EPA's Policy triggers the agency's Section 7 consultation obligations; indeed, although the threshold for ESA consultation is very low, the Policy creates an immediate and serious risk to imperiled wildlife. EPA effectively authorized regulated entities to forego routine compliance monitoring and reporting requirements over the course of six months under various environmental laws that protect listed species and their habitats along with public health. While information on specific regulated entities that have not complied with monitoring and reporting requirements due to COVID-19 is constrained by the limited data EPA has made public on waivers under the Policy—thus reinforcing the need for ESA Section 7 consultation—the available data shows that several regulated entities have sought waivers for compliance obligations for industrial and commercial operations where listed species are present and may be adversely affected. *See* Section I(A), *infra.*

Consequently, the EPA Policy certainly "may affect" listed species, and Section 7 consultation is required. In fact, since there is no obligation for regulated entities to "catch-up" with certain missed monitoring or reporting requirements, absent such consultation there will be no way for the EPA to ensure that its actions have not jeopardized listed species or critical habitat, as the ESA requires. 16 U.S.C. § 1536(a)(2) (2018). Yet, EPA failed to undertake *any* Section 7 consultation, including the emergency consultation process provided in the ESA regulations. EPA's failure to consult on the Policy is arbitrary, capricious, and in clear violation of the ESA. *See* Section I(B), *infra*.

### A. EPA's Policy is an Agency Action That "May Affect" Listed Species and Their Critical Habitats Requiring Section 7 Consultation

It is readily apparent that the EPA's Policy was an agency action that "may affect" listed species and critical habitats, requiring Section 7 consultation. First, the issuance of the EPA Policy was clearly an agency action within the meaning of the ESA. *See Karuk Tribe of Cal.*, 681

F.3d at 1021 (finding agency action subject to Section 7 where the agency "affirmatively authorized, funded, or carried out the underlying activity," and had "some discretion to influence or change the activity for the benefit of a protected species"). Here, the EPA took affirmative, discretionary action by issuing a specific policy that waived enforcement and allowed regulated entities to forego compliance with environmental legal obligations, including monitoring and reporting requirements set forth in permits, where such compliance was deemed impractical due to COVID-19.

Indeed, "agency action" is broadly defined in the ESA as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including all "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02 (2020). The suspension of monitoring and reporting requirements under bedrock environmental laws, such as CWA NPDES permits, certainly meets that definition. And, studies have in fact shown that pollution has increased because of the Policy, thereby adversely modifying land, water and/or air. CLAUDIA L. PERSICO, KATHRYN R. JOHNSON, THE EFFECTS OF INCREASED POLLUTION ON COVID-19 CASES AND DEATHS (2020); Pls.' 56.1 Statement ¶ 18. The EPA also retained discretion to influence the activities of regulated entities for the benefit of protected species because it had full authority to define the scope and applicability of the Policy, and thus to determine whether to allow the Policy to apply where listed species could be adversely affected. EPA also has authority to require permittees to provide information after the Policy is rescinded so it can assess the impacts on listed species through formal consultation.

Second, there also can be no doubt that the Policy "may affect" listed species or critical habitat, triggering the requirement to initiate and complete Section 7 consultation with the Services, as the ESA requires. 16 U.S.C. § 1536(a)(2) (2018). The Non-Enforcement Policy

suspends monitoring, reporting and enforcement of environmental legal obligations across the United States, *see* Ommen Decl. Ex. F, at 5-18; Pls.' 56.1 Statement ¶ 16, and the Policy implicates potential polluters' activities under most major environmental statutes, such as the Clean Air Act and Clean Water Act. Policy Memorandum at 2-6; Pls.' 56.1 Statement ¶ 5. Permits under these statutes often provide limitations on pollution specifically intended to safeguard listed species, while others provide general protections for water and air quality, and thereby afford important benefits to imperiled species.

For example, NPDES permits often impose effluent limitations along with monitoring and reporting requirements specifically intended to protect listed species. Indeed, because regulated effluent may adversely affect listed species, EPA must engage in Section 7 consultation before it issues NPDES permits where effluent will reach receiving waters that provide habitat for such species, highlighting the potential for harm from suspension of NPDES permit requirements. *See* 50 C.F.R. § 402.16 (2020). Therefore, the suspension of permitting requirements under the NPDES program certainly "may affect" listed species.

These impacts are evidenced by permits included in EPA's partial disclosure of entities that sought a waiver for NPDES permits obligations under the Policy. Ommen Decl. Ex. F, at 5-18; Pls.' 56.1 Statement ¶ 16. While the list only contains waiver requests as of July 7, 2020—providing only a small subset of the permittees that ultimately received waivers—it shows that over 350 NPDES permittees did not comply with monitoring and reporting requirements, purportedly due to COVID-19, emphasizing the potential for extensive impacts from the EPA's policy. In fact, while EPA has not made public a full list of waivers that have been provided to polluters under the Policy, it has been reported by the Associated Press that "waivers were granted in more than 3,000 cases," including "[h]undreds of requests [] for oil and gas

15

companies." Ellen Knickmeyer et al., *Thousands Allowed to Bypass Environmental Rules in Pandemic*, ASSOCIATED PRESS (Aug. 24, 2020), https://apnews.com/article/3bf753f9036e7d88f4746b1a36c1ddc4; Pls.' 56.1 Statement ¶ 19. These waivers were also sought by wastewater treatment plants, organic chemicals manufacturing, and other commercial and industrial activities, Ommen Decl. Ex. F, at 5-18; Pls.' 56.1 Statement ¶ 16, including several— and possibly hundreds once the full extent of the waivers is divulged—where the receiving waters are relied upon by listed species. Ommen Decl. Ex. F, at 5, 7; Pls.' 56.1 Statement ¶ 17.

These waivers implicate adverse impacts to listed species or critical habitats because such waivers allow regulated entities to pollute beyond the effluent limits in their permits (or at least to suspend monitoring to ensure that such limits are maintained, with no fear of enforcement), resulting in increasing levels of chemicals, suspended sediments, or temperature variations in the receiving waters. *See Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 15 (D.D.C. 2014) (explaining that the "may affect" threshold is easily met). Because waivers were sought for NPDES permits that control the discharge of pollutants into habitat for endangered species, such as Atlantic sturgeon in the Connecticut River, it is without doubt that the Policy "may affect" listed species.

Again, a study by the School of Public Affairs at American University confirmed that the EPA Policy has resulted in an increase in pollution, confirming the long-held belief that in the absence of regulatory enforcement, permittees tend to increase pollution output. CLAUDIA L. PERSICO, KATHRYN R. JOHNSON, THE EFFECTS OF INCREASED POLLUTION ON COVID-19 CASES AND DEATHS (2020); Pls.' 56.1 Statement ¶ 18. Considering the widespread application of the Policy across the country, the various environmental laws that are affected, and the hundreds (and even thousands) of waivers that were provided under the Policy, it is more than likely that

the Policy has resulted in increased pollution and contamination of habitats and food sources

listed species rely on. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d at 496 (finding that

"[t]he sheer number of acres affected" by an agency action and the "number of special status

species who reside on those lands" suggests that the action "may affect" listed species or critical

habitat).

Indeed, because the EPA Policy grants discretion to regulated entities to determine

unilaterally whether their compliance is "reasonably practicable," and expresses EPA's intent not

to seek penalties for violations of monitoring, testing, and reporting requirements, Policy

Memorandum at 1; Pls.' 56.1 Statement ¶ 7, EPA has created an incentive for permittees to

increase pollution without consequences. However, it does not matter whether this increase in

pollution was due to purposeful exploitation of the Policy or an actual inability to comply with

environmental legal obligations due to COVID-19. Regardless of the reason, hundreds (maybe

even thousands) of regulated entities have sought waivers under the Policy, creating a very real

risk of harm for listed species from unmonitored and unreported contamination of habitat that

such species depend on.

Given that the term "may effect" is broadly interpreted to include "[a]ny possible effect,

whether beneficial, benign, adverse, or of an undetermined character" 50 C.F.R. § 402.14(a)—

and the consultation requirement is "easily triggered" 51 Fed. Reg. 19,926, 19,929 (June 3,

1986)—the suspension of monitoring, reporting and enforcement of bedrock environmental laws

clearly meets the low threshold for the Section 7 consultation requirement. *See Karuk*, 681 F.3d

at 1,027. Indeed, the burden rests with "the Federal agency to show the absence of likely, adverse

effects to listed species or critical habitat as a result of its proposed action in order to be excepted

from the formal consultation requirement." 51 Fed. Reg. at 19,929. EPA cannot meet that burden

here. Consequently, EPA's failure to consult on the policy is arbitrary, capricious and in blatant violation of the ESA.

**B.   EPA Failed to Even Follow the Service's Emergency Consultation Process.**

As set forth above, it is readily apparent that the EPA's Policy is an agency action that "may affect" listed species and critical habitats; therefore, EPA was required to consult with the Services to comply with Section 7(a)(2) of the ESA. The ESA requires that such consultation be initiated at the "earliest possible time," 50 C.F.R. § 402.14 (2020), and completed prior to implementing the agency action. *See* 16 U.S.C. § 1536(d) (2018). However, even if EPA maintains that the Policy was necessary to urgently respond to a public health crisis, that does not relieve EPA from its duty to comply with the clear requirements of Section 7. Indeed, the Supreme Court has made clear that listed species are to be afforded the "highest of priorities," *Tenn. Valley Auth.*, 437 U.S. at 194, and courts have made clear that compliance with the ESA's procedural requirements is critical to ensuring that the substantive protections of the Act are effectuated. *See e.g. Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987).

The ESA implementing regulations in fact specifically contemplate the need for emergency actions that "may affect" listed species, but which require an immediate response. *See* 50 C.F.R. § 402.05 (2020). As described in detail in the Services' Handbook, the emergency consultation process allows an agency to take immediate action without first going through formal consultation, but requires the agency to notify the Services and to seek advice to minimize the effects of the emergency response, Handbook at 8-1, and then requires formal consultation to be initiated "as soon as practicable after the emergency is under control." 50 C.F.R. § 402.05(b); Handbook at 8-1.

Here, EPA never contacted the Services to discuss the potential impacts of the Policy, Ommen Decl. Exs. C, D, E; Pls.' 56.1 Statement ¶ 14, and the agency stipulated that it has not taken any steps to initiate consultation, including emergency consultation, with the Services. Ommen Decl. Ex. G; Pls.' 56.1 Statement ¶ 13. EPA has not made any documents publicly available explaining how the agency will comply with the Services' consultation procedures or otherwise fulfill the EPA's Section 7 duties. Thus, even assuming that EPA could establish that the Policy was in response to an "emergency" as defined in the ESA, EPA failed to follow the pertinent process.

The emergency consultation process is intended to provide a straightforward way for agencies to ensure that they do not jeopardize listed species while responding to emergencies. Complying should not be onerous, given it merely requires agencies to discuss the emergency response with the Services, and then to proceed with formal consultation after the emergency has passed. Regardless, the Supreme Court has specifically held that the Section 7 "mandate applies to *every discretionary action*—regardless of the expense or burden its application might impose." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 671 (2007) (emphasis added). The duty to consult also applies whether an agency action is "ongoing" or "complete." *Cottonwood Envtl. Law Ctr. v. United States Forest Serv.*, 789 F.3d 1075, 1086 n.12 (9th Cir. 2015), *cert. denied*, 137 S. Ct. 293 (2016). EPA simply has no basis for evading its ESA duties.[3]

---

[3] Any claim by EPA that it has terminated the policy does not foreclose the need for relief, given that (a) EPA may resume the policy at any time, particularly given the ongoing pandemic; (b) adverse effects to listed species have never been addressed in the manner mandated by the ESA; and (c) injunctive and declaratory relief is available that can help to address Plaintiffs' injuries.

Conducting, at the very least, emergency consultation on the Policy is essential for the EPA and the Services to determine whether listed species and their habitats have been adversely affected, and whether mitigatory actions are required to address harm from increased pollution that occurred due to the EPA Policy. This is particularly important because the Policy does not require facilities to "catch up" with missed monitoring or reporting requirements. *See* Policy Memorandum at 4, Pls.' 56.1 Statement ¶ 10. Therefore, absent consultation there will be no way for EPA to ensure that the agency has not jeopardized species in violation of the ESA.

In sum, EPA's refusal to initiate and complete consultation—including emergency consultation—for the Policy constitutes a failure to ensure that its actions are not likely to jeopardize the existence of listed species or result in destruction or adverse modification of critical habitat, in violation of Section 7 of the ESA. 16 U.S.C. § 1536(a)(2) (2018). Such action is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law within the meaning of the APA. 5 U.S.C. § 706(2) (2018). Summary Judgment in favor of plaintiffs is warranted and an Order compelling compliance with the emergency consultation process by a date certain is appropriate.

## II.   EPA'S FAILURE TO CONSULT CONSTITUTES AN AGENCY ACTION UNLAWFULLY WITHHELD IN VIOLATION OF THE APA

As discussed above, EPA was required to consult with the Services to ensure that the Policy did not jeopardize listed species or adversely modify critical habitat, as required by Section 7(a)(2) of the ESA. EPA failed, however, to undertake any form of Section 7 consultation, including the emergency consultation process. The failure to consult was arbitrary, capricious, and in violation of the ESA. Consequently, Plaintiffs are entitled to judgment on their claim under the ESA citizen suit provision, which alone sufficient to resolve this case.

Alternatively, however,  the failure to consult on the Policy also constitutes agency action that has been unlawfully withheld in violation of section 706(1) of the APA. An agency action is "unlawfully withheld" when the agency refuses to comply with a statutory duty, such as failing to meet a deadline prescribed by Congress. *NRDC*, 93 F. Supp. 2d at 543. As discussed above, EPA has a statutory duty to consult on the Policy, and such consultation must be initiated at the "earliest possible time," 50 C.F.R. § 402.14 (2020), and completed prior to implementing the agency action. *See* 16 U.S.C. § 1536(d) (2018). EPA even disregarded the emergency consultation process by failing contact the Services when the Policy was initiated and refusing to consult once the Policy was rescinded. EPA's failure to initiate *any* form of consultation with the Services violates its statutory ESA duty, and therefore constitutes agency action "unlawfully withheld" in violation of APA Section 706(1). Accordingly, the Court should find that the EPA has unlawfully withheld required agency action in violation of APA Section 706(1).

## REMEDY

Based on the foregoing, Plaintiffs respectfully request the Court enter the following relief: (1) a declaratory judgment that EPA violated the APA and the ESA and its implementing regulations by failing to ensure, through formal Section 7 consultation, that the Policy will not jeopardize the continued existence of threatened or endangered species, or destroy or adversely modify such species' critical habitats; (2) an Order enjoining any further reliance on or reinstatement of the Policy in the absence of compliance with ESA Section 7; (3) and an Order requiring EPA to consult with the Services regarding the Policy within thirty days.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment.

Dated: White Plains, New York
   October 12, 2020

           Respectfully submitted,

           s/ Todd D. Ommen
           Todd D. Ommen (TO-1340)
           Daniel Conant, Legal Intern
           Pace Environmental Litigation Clinic, Inc.
           78 North Broadway
           White Plains, NY 10603
           tommen@law.pace.edu
           (914) 422-4343
           *Attorneys for Plaintiffs Riverkeeper and*
           *Waterkeeper*

           */s/ Jared M. Margolis*
           Jared M. Margolis (OR Bar No. 146145)
           CENTER FOR BIOLOGICAL DIVERSITY
           2852 Willamette St. # 171
           Eugene, OR 97405
           Phone: (802) 310-4054
           Email: jmargolis@biologicaldiversity.org
           *Attorneys for Plaintiff Center for Biological*
           *Diversity*

22