**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CENTER FOR BIOLOGICAL DIVERSITY, WATERKEEPER ALLIANCE, INC., and RIVERKEEPER, INC.,

Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and ANDREW WHEELER, in his official capacity as Administrator of the United States Environmental Protection Agency,

Defendants.

Case No. 1:20-cv-06572 (JSR)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION .......................................................................................................... 1

DISCUSSION ................................................................................................................. 2

   I.    PLAINTIFFS HAVE ESTABLISHED STANDING. ......................................... 2

        A.    Plaintiffs Have Adequately Established Injury ........................................... 2

        B.    The Injuries Can Be Redressed By The Court ............................................. 8

        C.    Plaintiffs Have Established Organizational Standing ............................... 10

  II.   PLAINTIFFS' CLAIMS ARE NOT MOOT BECAUSE THE EPA REMAINS UNDER AN OBLIGATION TO CONSULT AND RELIEF CAN BE ISSUED COMPELLING IT TO DO SO. ...................................................................... 14

 III.  PLAINTIFFS HAVE ESTABLISHED DEFENDANTS VIOLATED THE ESA BY FAILING TO CONSULT ON THE EFFECTS OF THE POLICY ...................... 18

        A.    EPA's Decision to Implement the Policy was Patently an Agency "Action." ................................................................................................... 18

        B.    The EPA's Issuance Of The Policy Certainly "May Affect" Listed Species. ..................................................................................................... 20

 IV.  PLAINTIFFS DO NOT SEEK SUMMARY JUDGMENT ON THE ALTERNATIVELY PLED APA CLAIM. ..................................................... 23

  V.   PLAINTIFFS' PROPOSED REMEDIES ARE APPROPRIATE. ...................... 23

CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

## CASES

*Am. Fuel & Petrochem. Mfcs. v. EPA*, 937 F.3d 559 (D.D.C. 2019) ............................................ 24

*Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 (2017) ....................................................... 14

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................................... 6

*Bernstein/Glazer, LLC v. Babbitt*, 99 Civ. 1195, 2000 WL 32278 (S.D.N.Y. March 28, 2000).. 23

*Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) ....................................................... 7

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) ................................................................................................................... 11, 12, 14

*Cmty. Hous. Trust v. Dep't of Cons. and Reg. Affairs*, 257 F. Supp. 2d 208 (D.D.C. 2003) ....... 18

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ....................... 15

*Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075 (9th Cir. 2017) ........................................... 15

*Ctr. for Biological Diversity v. EPA*, 861 F.3d 174 (D.C. Cir. 2017) ................................... 5, 9, 24

*Ctr. for Biological Diversity v. Hamilton*, 385 F. Supp. 2d 1330 (N.D. Ga. 2005) ...................... 23

*Ctr. for Biological Diversity v. U. S. Fish & Wildlife Serv.*, 807 F.3d 1031 (9th Cir. 2015) 5, 9, 10

*Ecol. Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141 (9th Cir. 2000)........................................... 7

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001)............................ 15

*Haley v. Pataki*, 60 F.3d 137 (2nd Cir. 1995).............................................................................. 18

*Hall v. Norton*, 266 F.3d 969 (9th Cir. 2001) ............................................................................ 7, 9

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ......................................................... 12, 13

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012).................. 11, 20, 21, 23

*Lujan v. Defs. Of Wildlife*, 504 U.S. 555 (1992)........................................................................... 7

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2011) ....................... 12

*Nat. Res. Def. Council v. Jewell*, 749 F.3d 776 (9th Cir. 2014)................................................... 5

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)............................. 19

*Nat'l Ass'n of Home Builders v. Salazar*, 827 F. Supp. 2d 1 (D.D.C. 2011) .............................. 17

*Nat'l Family Farm Coalition v. EPA*, 966 F.3d 893 (9th Cir. 2020)................................... 5, 6, 8

*Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7 (D.D.C. 2014) .............................. 21

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011) .............................................................................. 12

*NRDC, Inc. v. Fox*, 93 F. Supp. 2d 531 (S.D.N.Y. 2000) ........................................................... 23

*Riverkeeper, Inc. v. Wheeler*, 373 F. Supp. 3d 443 (S.D.N.Y. 2019) ......................................... 23

*Riverkeeper, Inc. v. Wheeler*, No. 17 Civ. 4916, 2020 WL 1188455 (S.D.N.Y. March 12, 2020) ....................................................................................................................................... 23

*Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220 (9th Cir. 2008)............... 5, 6, 8, 9

*Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987)................................................................. 8

*TVA v. Hill*, 437 U.S. 153 (1978).......................................................................................... 18, 23

*Van Wie v. Pataki*, 267 F.3d 109 (2d Cir. 2001)......................................................................... 17

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011)................................... 2, 19

*Weinstein v. Bradford*, 423 U.S. 147 (1975)............................................................................... 18

*WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148 (9th Cir. 2015)............................. 7

## STATUTES

16 U.S.C. § 1536................................................................................................................. 8, 19

## REGULATIONS

50 C.F.R. § 402.02 ................................................................................................ 2, 20
50 C.F.R. § 402.05 ................................................................................ 14, 16, 24, 25
50 C.F.R. § 402.14 ................................................................................................ 2, 20
50 C.F.R. § 402.16 ...................................................................................................... 15

## OTHER

51 Fed. Reg. 19,926 (June 3, 1986) ................................................................... 21
Endangered Species Consultation Handbook 8-1 (1998) ............................ 16, 25

**INTRODUCTION**

This case concerns a broad policy memorandum that EPA issued in March advising regulated entities that the agency would not enforce environmental legal obligations, including monitoring and reporting requirements in NPDES permits, or impose penalties under various environmental laws during the COVID-19 pandemic (the "Policy"). Plaintiffs have established that this Policy is an agency action that "may affect" listed species, triggering EPA's obligation to analyze and address those impacts—with the expert agencies—through Endangered Species Act ("ESA") Section 7 consultation.

Despite the lack of information that EPA has made publicly available regarding waivers under the Policy, Plaintiffs were able to provide specific examples of permittees that took advantage of the EPA Policy and did not comply with legal requirements in areas where listed species are present. Furthermore, the record indicates that the EPA Policy has in fact led to increased pollution output, because in the absence of enforcement and penalties permittees increase pollution. Whether that increased pollution was purposeful or from a lack of monitoring due to COVID-19 makes no difference to the imperiled species that are adversely affected by the lack of enforcement under the EPA Policy. Regardless of the purported need for the Policy and EPA's contention that the Policy did not intend to allow for non-compliance, EPA has a duty to ensure that its action—here, the issuance of a Policy that has had the effect of undermining protections for listed species—does not jeopardize the continued existence of imperiled wildlife, in violation of the ESA.

This is not an inconsequential legal violation. The duty imposed on federal agencies to consult and thereby prevent jeopardy is one of the ESA's most fundamental safeguards for imperiled species. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir.

2011) (describing Section 7 consultation as the "heart of the ESA"). To comply with this duty, Section 7(a)(2) and its implementing regulations set forth a detailed consultation process that must be followed before agencies take actions that, in any manner, "may affect" listed species. Agency "action" is defined broadly to include, *inter alia*, all activities carried out by agencies, including any "actions directly or indirectly causing modifications to the land, water, or air," 50 C.F.R. § 402.02. Indeed, the consultation obligation applies to "all activities or programs *of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies*" that "may affect" listed species or critical habitat in any manner. *Id.* § 402.14 (emphasis added). The national, industry-wide EPA Policy certainly meets this low threshold.

Defendants advance no legitimate argument that issuance of the Policy was not an agency action that "may affect" species, but rather focus on standing and mootness arguments that ignore the applicable case law. However, Plaintiffs have established both member and organizational standing, and the Court can provide meaningful relief by ordering EPA to undertake consultation now that the emergency Policy has been terminated, consistent with the ESA implementing regulations. Accordingly, the Court should reject Defendants' attempt to sidestep the clear requirement to undertake ESA Section 7 consultation on the Policy, and grant Plaintiffs' Motion for Summary Judgment.

## DISCUSSION

## I.     PLAINTIFFS HAVE ESTABLISHED STANDING.

### A.  *Plaintiffs Have Adequately Established Injury.*

Plaintiffs have adduced sufficient factual support to establish standing to bring this case. As set forth in Plaintiffs' Complaint, Motion for Summary Judgment, and accompanying declarations, the EPA instituted a policy that has direct implications for the continued existence of listed species, which harms the interests of Plaintiffs. Plaintiffs are conservation organizations

2

and their members have a clearly cognizable interest in protecting listed species; indeed, it is their primary purpose. *See* Dulong Decl. ¶¶ 6-8, Doc. 26; Estrin Decl. ¶¶ 4, 6, Doc. 28; Greenwald Decl. ¶¶ 3-6, Doc. 30; Pls.' 56.1 Statement ¶¶ 22-23, 52-53, 60, Doc. 24. And even though EPA has refused to make specific information on waivers under the Policy available to the public, Plaintiffs were nonetheless able to uncover examples of specific waiver requests where listed species, and thus Plaintiffs' interests, were implicated. The record evidence also shows that increases in pollution are likely to occur absent enforcement of permit obligations, and studies have shown that the EPA Policy has indeed led to increased pollution. Thus, consultation is required to ensure that listed species have not been jeopardized by actions undertaken pursuant to the Policy. The resulting harm to Plaintiffs' interests can be redressed by the Court ordering EPA to complete the required consultation.

Defendants attempt to misdirect the Court's attention by asserting that the EPA Policy did not suspend any permit requirements and that Plaintiffs' claims are therefore based on a misrepresentation of what the Policy does. Defs.' Opp'n Mem. 6-7, 11, Doc. 32. But that misses the point of Plaintiffs' claims. The Policy, by EPA's own admission, was a sweeping announcement of EPA's enforcement discretion that explicitly provided notice to regulated entities that the agency would not seek enforcement of environmental legal obligations or impose penalties for failures to meet such obligations. It makes no difference that the Policy did not change the underlying substantive permit requirements. The fact remains that the EPA took an action that, *in effect*, relieved regulated entities of certain obligations—and *in fact* resulted in increased pollution—thereby placing in harm's way listed species that Plaintiffs work to protect.

Defendants ignore the vital function of enforcement authority, which is designed to ensure that permittees actually comply with substantive legal obligations. If enforcement and

3

penalties were unnecessary to ensure compliance, then there would be no reason for EPA to even have an enforcement program. The reality is that in the absence of enforcement of monitoring and reporting requirements, entities can and do increase pollution output. *See* Pls.' Mem. in Supp. of Summ. J. ("Pls.' Mem.") 10, 16-17, Doc. 23. By creating a policy that told permittees that they would be off the hook for violations of environmental legal obligations, EPA essentially gave the green light for non-compliance, even if the Policy did not specifically remove those obligations and such non-compliance could be blamed on the pandemic.

Unsurprisingly, the record evidence shows that pollution levels have in fact increased due to EPA's Policy. Pls.' Mem. 14. And while Defendants take issue with Plaintiffs' reliance on the study from American University because it focused on air pollution, that misses the point. The study specifically found that EPA's rollback of environmental enforcement pursuant to the Policy *has* resulted in increased pollution and confirms the common-sense notion that, in the absence of any threat of enforcement, some regulated entities will respond by increasing pollution output. Defendants do not explain why this would differ under the Clean Water Act. Defendants provide no compelling argument in response, other than the counterintuitive argument that courts must presume permittees will comply with the law even in the absence of any threat of enforcement and regardless of the factual record evidence to the contrary.

This potential increase in pollution from hundreds, if not thousands, of waivers that permittees sought under the Policy harm Plaintiffs' members' interests in protecting listed species. Defendants' assertion that Plaintiffs must be able to show specific injuries to specific listed species ignores the basis for Plaintiffs' claim. The failure to consult under Section 7 is a *procedural* violation of the ESA, and because EPA failed to consult with the expert agencies, there has been no analysis of the actual impacts of the EPA Policy on listed species. This is the

essence of the injury caused by EPA's refusal to comply with the ESA. Consequently, Plaintiffs have been as specific in their allegations as possible in view of EPA's violation. Since the information regarding the waivers sought under the Policy is in the sole possession of the EPA, which has not only refused to consult but has also failed to make that information public even after receiving several FOIA requests, it is irrational for EPA to now claim that Plaintiffs lack standing due to the dearth of information on species impacts for which EPA itself is responsible and that is the gravamen of Plaintiffs' procedural claim.

EPA's effort to rely on its own opacity as a basis for defeating standing is exactly why courts in comparable situations have routinely held that where the plaintiffs' claims concern a procedural injury, the burden to show causation and redressability is relaxed. *Ctr. for Biological Diversity v. U. S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1044 (9th Cir. 2015); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174 (D.C. Cir. 2017) (challenge to agency's failure to meet its consultation obligation under Section 7(a)(2) was an "archetypal procedural injury") (additional citations omitted). Indeed, as the Ninth Circuit recently reinforced, there are specific "rules of Article III standing that apply to procedural injuries in determining Petitioners' standing. . . ." *Nat'l Family Farm Coalition v. EPA*, 966 F.3d 893, 909 (9th Cir. 2020) (citing *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014)). There, the Court held that "[i]n the context of procedural violations, the injury-in-fact requirement is met if 'the procedures in question are designed to protect some threatened concrete interest of [the petitioner] that is the ultimate basis of his standing.'" *Id.* (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1225 (9th Cir. 2008)).

Defendants ignore the relevant precedent; however, *Nat'l Family Farm Coalition* is squarely on point. There, the Court found that the conservation organization had standing

because one of its members submitted a declaration stating that the pesticide at issue was approved for use in the state where she lives, and that she "enjoys observing endangered species where she lives." *Id.* at 911. Therefore, the court found that Plaintiffs had shown "an aesthetic and recreational interest that is geographically linked to the individual asserting the claim, thereby satisfying the injury-in-fact requirement." *Id.* (citations omitted). The Court reasoned that the "the ESA's consultation procedures" are specifically "designed to protect these concrete interests." *Id.* (citing *Salmon Spawning*, 545 F.3d at 1229). Standing was present because "[t]hese procedures are designed to advance the ESA's overall goal of species preservation, and thus the groups' specific goals[,]" as well as "ensur[e] agency compliance with the ESA's substantive provisions." *Id.* (citing *Salmon Spawning*, 545 F.3d at 1226; *Bennett v. Spear*, 520 U.S. 154, 176 (1997)).

The same applies here. Plaintiffs have submitted declarations asserting their members' scientific, aesthetic and recreational interest in protecting endangered species such as sturgeon, which may be harmed by increased pollution covered by the Policy. *See* Waldman Decl., Doc. 27; Hamel Decl., Doc. 25; Pls.' 56.1 Statement ¶¶ 33-49. Plaintiffs also provided declarations explaining the organization's interests in species that are implicated by the Policy, including from members and staff that study and work to protect these species. *See* Waldman Decl.; Hamel Decl.; Pls.' 56.1 Statement ¶¶ 33-49.

Moreover, Plaintiffs have established a geographic link between their members' interests in endangered Atlantic and shortnose sturgeon and the Policy because the Policy has resulted in waivers being sought by polluters who discharge to bodies of water that serve as habitat for these species. Compl. ¶¶ 20, 58, Doc. 1; Pls.' Mem. 9-10. Even though EPA has not made any information readily available to the public regarding waivers under the Policy, Plaintiffs were

able to obtain information on waiver requests, and provided examples of specific permits that implicate these species.[1] This included waiver requests from wastewater treatment plants, organic chemicals manufacturing, and other commercial and industrial activities, several of which impact waterways that are relied upon by endangered Atlantic and shortnose sturgeon. *See* Pls.' Mem. 9. These allegations are sufficient to establish injuries in fact. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 562-63 (1992) (the "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"); *Cantrell v. City of Long Beach*, 241 F.3d 674, 680-82 (9th Cir. 2001) (plaintiffs had standing where they had visited an area to watch birds in their natural habitat and defendant's planned removal of that habitat would interfere with plaintiffs' ability to enjoy watching the birds in the future).

And it takes "no attenuated chain of conjecture" to "link" these violations of law to Plaintiffs' and their members' injuries. *See Ecol. Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000) (finding no attenuated chain where alleged violations of the Clean Water Act diminished plaintiffs' enjoyment of nature). As the Ninth Circuit has explained, where an agency has failed to undertake a required procedure that would protect plaintiffs' interests, the plaintiffs need not show specific harm, but instead the standing inquiry focuses on whether the plaintiffs' injury is "fairly traceable to the challenged conduct," *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015)—that is, the causation requirement is satisfied by showing a "reasonable probability of the challenged action's threat to [plaintiffs'] concrete interest." *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001).

---

[1] The fact that Plaintiffs had to undertake such efforts to obtain basic data on waivers requested under the Policy further supports Plaintiffs' organizational standing, as discussed below.

Here, the EPA's failure to consult is a procedural violation of the ESA, and Section 7's procedural requirement is critical to ensuring that the substantive protections of the Act are effectuated, including the duty to ensure against jeopardy. *See e.g. Sierra Club v. Marsh*, 816 F.2d 1376, 1384 (9th Cir. 1987); *see also* 16 U.S.C. § 1536(a)(2). The failure to consult thereby jeopardizes listed species, which undermines the specific interests of Plaintiff organizations, as set forth in their declarations.

Therefore, Plaintiffs *have* shown sufficient specificity regarding harm and causation—particularly in the context of a procedural ESA violation.[2] Simply put, the EPA's issuance of the Policy harms Plaintiffs' interests, and the lack of ESA Section 7 consultation on the EPA's discretionary action is the cause in fact of such harm, providing a well-settled basis for standing.

### B.   The Injuries Can Be Redressed By The Court.

When considering the test for standing regarding a procedural violation, such as the failure to consult pursuant to ESA Section 7, the causation requirement is relaxed where Plaintiffs have established injury in fact. *See Nat'l Family Farm Coal.*, 966 F.3d at 910; *Salmon Spawning*, 545 F.3d at 1226. Indeed, the causation requirement is satisfied by showing a "reasonable probability of the challenged action's threat to [plaintiffs'] concrete interest." *Hall v.*

---

[2] The Court should not condone Defendants' attempt to hide the ball by preventing the public from procuring information about the environmental legal obligations that were not complied with pursuant to the Policy, and then turning around to claim that Plaintiffs lack standing because they have not shown specific enough harm. While Plaintiffs believe that they have proffered sufficient evidence of injury, should the Court agree with Defendants that Plaintiffs have not provided adequate specificity regarding harm to listed species, the Court should still not be able to rule in favor of Defendants, because there would be an issue of material fact that cannot provide a basis for summary judgment. Rather, pursuant to Federal Rule of Civil Procedure 56(d), the Court should then allow Plaintiffs to undertake limited discovery, since additional information regarding the waivers is otherwise unavailable. *See* Ommen Decl.; *see also Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303-04 (2nd Cir. 2003) (defendants' motion for summary judgment was "premature" when a district court denied 56(d) relief and the court did not afford plaintiff "any opportunity" to conduct discovery to oppose defendants' motion).

*Norton*, 266 F.3d 969, 977 (9th Cir. 2001) (internal quotation marks and citation omitted). To satisfy the redressability requirement, then, Plaintiffs need only show "that the relief requested— that the agency follow the correct procedures—*may* influence the agency's ultimate decision . . . ." *Salmon Spawning*, 545 F.3d at 1226-27 (emphasis added). Of course in the context of an emergency consultation—which unlike the normal process comes after the action has been completed—the process is not intended to influence the agency's decision regarding whether or not to undertake the action, but rather how it will respond to the impacts of the emergency on listed species once the action is complete.

Therefore, the redressability requirement is met here, because Plaintiffs have shown that the relief requested, *i.e.*, that the EPA consult with the Services on the impacts of the Policy on listed species, *would* protect their interest. *Ctr. for Biological Diversity*, 807 F.3d at 1044; *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 185 (D.C. Cir. 2017) ("all the Center need show is that a revisitation of the [agency action] that includes an effects determination and any required consultation would redress Center members' injury because the [agency] *could* reach a different conclusion"). Plaintiffs have alleged that EPA's failure to undertake ESA Section 7 consultation on the Policy directly impedes their central mission and harms the interests of the organizations and members "in ensuring imperiled species and the habitats they rely on are protected." Greenwald Decl. ¶ 15; Pls.' 56.1 Statement ¶ 29. As explained, "if this Court were to hold that EPA has shirked its mandatory duties under the ESA and must now consult in the manner required by the ESA and implementing regulations, steps could be taken to ameliorate adverse impacts on listed species and their habitats resulting from the nonenforcement policy, and significantly more information would be available to the Center and, in turn, its members regarding such impacts and measures that could be taken to ameliorate them." *Id.* ¶ 18; Pls.' 56.1

Statement ¶ 32. The Court can therefore provide meaningful relief to redress Plaintiffs' harms by requiring EPA to consult with the Services.

Furthermore, as set forth in Plaintiffs' opening brief, the Services' implementing regulations provide that in emergency situations such as those at issue here, the formal consultation takes place *after* the agency action is complete. Pls.' Mem. 5. Therefore, not only are Plaintiffs' claims not moot, as discussed further below, but the injury is redressable because EPA can, and must, now review all of the entities that were granted waivers for failure to comply with their environmental legal obligations, and assess whether listed species could have been adversely affected by such noncompliance, and then engage with the Services to determine whether mitigation is necessary to ensure against jeopardy. *See Ctr. for Biological Diversity*, 807 F.3d at 1044 (explaining that formal consultation under ESA Section 7 is "designed to protect [a plaintiff's] concrete interests" by "advancing the ESA's overall goal of species preservation" and "ensuring agency compliance with the ESA's substantive provisions" (internal quotation marks and alterations omitted)).

### C.  Plaintiffs Have Established Organizational Standing

While the injuries to the interests of Plaintiffs' members as set forth above are sufficient to establish standing, Plaintiffs have also established that the Plaintiff organizations themselves have been injured by the EPA Policy, both through impairment of their fundamental missions to protect listed species and diversion of resources from other critical tasks. Compl. ¶¶ 25-26. In response, Defendants mistakenly assert that Plaintiffs rely only on "informational standing" to support their organizational standing and argue that Plaintiffs are not statutorily entitled to any specific information. Defs.' Opp'n Mem. 2, 10, 17-18. This misconstrues the basis for organizational standing as well as the applicable Circuit precedent holding that standing may be

10

established through allegations "that the defendant has caused [the organization] to divert its resources *or* has hindered its mission." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-111 (2d Cir. 2017). Here, Plaintiffs have adequately asserted *both* kinds of organizational injuries, either of which is sufficient.

As for the interference with Plaintiffs' missions, protecting listed species is one of the primary objectives of the Plaintiff organizations. Compl. ¶¶ 17, 25; *see also* Greenwald Decl.¶ 5 ("we work to secure a future for all species, great and small, hovering on the brink of extinction"); Pls.' 56.1 Statement ¶¶ 22, 23. Plaintiffs maintain that the EPA Policy removes the impetus for regulated entities to avoid or ameliorate their adverse impacts on listed species, which severely impedes Plaintiffs' ability to carry out their core missions. *See* Greenwald Decl. ¶ 14; Pls.' 56.1 Statement ¶ 28. Plaintiffs have "a long history of taking action to protect imperiled species from pollution," Greenwald Decl. ¶ 15, and EPA's failure to undertake consultation on the Policy harms Plaintiffs' interests in "ensuring imperiled species and the habitats they rely on are protected." *Id.*; Pls.' 56.1 Statement ¶ 29. This is more than sufficient to show that the EPA's actions have interfered with and impeded Plaintiffs' mission.

Defendants do not dispute that the conservation of listed species is at the heart of Plaintiffs' organizational missions or even that actions taken pursuant to the EPA Policy have resulted in harm to listed species and thereby adversely affected Plaintiffs' organizational interests. Instead, Defendants set up a straw man argument by focusing on "informational standing"—which is distinct from the organizational standing theory asserted—and ignore that the Section 7 process is not merely meant to inform the public about harm to listed species, but is a procedural mandate essential for the implementation of the ESA's substantive duty to prevent jeopardy. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en

banc) (observing that compliance with ESA's procedural requirements is critical to effectuating the Act's substantive protections). Thus, Plaintiffs are not relying on informational standing—which turns on whether there is a statutory right to specific information that has been denied (such as in a FOIA case)—but rather on *organizational* injuries to Plaintiffs' core missions of safeguarding listed species. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

To be clear, Plaintiffs are not asserting that the ESA affords them a legal right to information unconnected to any underlying interest in the conservation of listed species. Rather, while Plaintiffs have alleged that they would obtain information relevant to their organizational missions if EPA complied with its legal obligations, the primary basis for organizational standing is the substantive protections that consultation would afford species, which would thereby protect Plaintiffs' concrete interests. In any case, Defendants' arguments must fail because the Second Circuit has "repeatedly held that 'only a *perceptible impairment*'" of an organization's activities is necessary for there to be an "injury in fact." *Centro*, 868 F.3d at 110 (emphasis added) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). Defendants cannot dispute that Plaintiffs have established, at the very least, a "perceptible impairment" of their conservation missions. *See Centro*, 868 F.3d at 110 ("[w]e have held that an organization shows injury-in-fact where, as here, a 'policy has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]'") (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2011)); *see also Nnebe*, 644 F.3d at 156 (explaining that organizational standing may be established based on "scant" evidence of actual impairment).

This itself is sufficient for organizational standing. However, Plaintiffs have also satisfied Circuit precedent for such standing by establishing that the EPA Policy has harmed the Plaintiff organizations by requiring them to divert their limited resources and personnel in an attempt to

fill the gap left by the EPA's abandonment of enforcement of environmental legal obligations that mitigate the impact of industrial activities on listed species. Compl. ¶ 25. As Plaintiffs set forth in their declarations, EPA's actions have required Plaintiffs to "divert resources from other critical tasks that would not have been necessary absent EPA's actions here, which has impaired our fundamental mission to protect the environment and imperiled species." Greenwald Decl. ¶ 16; *see also* Estrin Decl. ¶ 14; Pls.' 56.1 Statement ¶¶ 30, 56. Plaintiffs further explained that the EPA's actions required Plaintiffs to "divert and expend resources and staff even to learn about the adverse effects of the EPA policy," including through Freedom of Information Act requests and examining hundreds of permits to determine whether listed species may have been adversely affected by unmonitored pollution. Compl. ¶ 25; Greenwald Decl. ¶ 16; Pls.' 56.1 Statement ¶ 30. EPA's actions thereby "required the expenditure of personnel and resources even to learn about and monitor the adverse impacts on species associated with" the Policy, directly undermining Plaintiffs' "ongoing efforts to enforce environmental laws that protect listed species and the habitats they rely on." Greenwald Decl. ¶ 16; Pls.' 56.1 Statement ¶ 30.

Defendants completely ignore this basis for organizational standing and fail to address this Circuit's well-settled precedent that "where an organization diverts its resources away from its current activities" in an effort to counteract the effects of unlawful behavior "it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro*, 866 F.3d at 111 (citing *Havens Realty Corp.*, 455 U.S. at 379). Since Plaintiffs are non-profit conservation organizations with limited resources that can be dedicated to protecting species and the habitats they rely on, EPA's actions impeded Plaintiffs' ability to carry out their core mission. *See Havens Realty Corp.* 455 U.S. at 378-79. This affords the Plaintiff conservation organizations with an independent basis for standing. *See Centro*, 868 F.3d

at 111 ("[s]ignificantly, the Supreme Court has recently reaffirmed *Havens Realty*'s holding that a nonprofit organization establishes an injury-in-fact if, as here, it establishes that it 'spent money to combat' activity that harms its organization's core activities") (quoting *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017)).

Plaintiffs have therefore met their burden to establish organizational standing, which affords an independent basis for allowing this case to proceed to the merits.

II.  **PLAINTIFFS' CLAIMS ARE NOT MOOT BECAUSE THE EPA REMAINS UNDER AN OBLIGATION TO CONSULT AND RELIEF CAN BE ISSUED COMPELLING IT TO DO SO.**

Defendants argue that Plaintiffs' Complaint is moot because the EPA Policy has been terminated, preventing the court from providing any effectual relief. Defs.' Opp'n Mem. 18. Not so. Indeed, Defendants have not come close to sustaining their "heavy burden" to establish that there remains no relief that can be fashioned for EPA's violation of Section 7. And, even if the challenge would otherwise be moot, exceptions to the mootness doctrine apply.

While certain aspects of Plaintiffs' requested relief may no longer be at issue—such as an injunction against the continued reliance on the Policy—the Court may still provide meaningful relief by requiring EPA to initiate Section 7 consultation, which would entail the agency working with the Services to identify permittees that missed monitoring and reporting requirements pursuant to the Policy to determine whether listed species may have been adversely affected, and to address any harm with appropriate mitigation to ensure against jeopardy, as the ESA requires. Because the EPA's duty to ensure against jeopardy does not end with the termination of the Policy and requiring post-action consultation is consistent with the Services' implementing regulations, this matter is not moot. *See* 50 C.F.R. § 402.05; Defs.' Opp'n Mem. 9.

Defendants ignore that termination of the EPA Policy cannot moot Plaintiffs' claims because the EPA's duty to comply with Section 7 of the ESA is ongoing. Indeed, Defendants fail to cite any case law suggesting that the Section 7 duty ceases to exist once an agency action has been terminated. That is because such a decision would be anathema to the clear direction in the ESA that agencies must "insure" against jeopardy. Rather, an agency's duty to consult applies whether an agency action is "ongoing" *or* "complete." *Ctr. for Biological Diversity v. EPA*, 847 F.3d 1075, 1084 (9th Cir. 2017). This is evidenced by the regulations regarding reinitiation of consultation, which apply even when the action is completed, so long as the agency retains discretionary involvement or control. *See* 50 C.F.R. § 402.16; *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1086, 1086 n.12 (9th Cir. 2015) ("even if the agency action is complete and not 'ongoing,' the agency still may be required to reinitiate consultation . . . .") (citations omitted); *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("[t[he [S]ection 7 duty to consult can be ongoing"). Here, EPA certainly has and retains control over permittees compliance with EPA-issued permits, and the Policy was issued, and could be reissued, at its discretion. Since the duty to prevent jeopardy is ongoing, termination of the Policy cannot moot Plaintiffs' claims.

Moreover, termination of the Policy does not prevent the Court from providing relief that would directly address the harms suffered by Plaintiffs: ordering EPA to undertake Section 7 consultation to identify and address impacts to listed species from missed monitoring and reporting requirements to ensure that imperiled species have not been jeopardized. Defendants' arguments regarding "retroactive" ESA consultation are mistaken, particularly in the context of an emergency action, where the Services' implementing regulations specifically require formal consultation *following* completion of the action. Indeed, the regulations specifically *require* the

agency to undertake formal consultation "as soon as practicable *after* the emergency is under

control." 50 C.F.R. § 402.05(b).[3] Therefore, termination of the Policy does not moot the claim

that EPA must consult to fulfill its ESA duties, and the Court can still provide meaningful relief.

And it is readily apparent that consultation would provide specific benefits, and therefore

meaningful relief. Defendants in fact concede that consultation is not an end itself, but rather a

process that is necessary to effectuate the substantive protections afforded listed species under

the ESA. Defs.' Opp'n Mem. 20. That is precisely why the Services require formal consultation

*after* an emergency action is concluded. Such consultation is vital because "[d]ocumenting

jeopardy and adverse modification biological opinions is particularly important to tracking the

effect on species and habitat conditions," and allows the expert wildlife agencies the opportunity

to ensure that the action did not jeopardize species, and if so to require "further action [to] restore

or enhance the species to a level below the jeopardy threshold." Handbook at 8-4. Plaintiffs

pointed to this in their Memorandum, stating that "emergency consultation on the Policy is

essential for the EPA and the Services to determine whether listed species and their habitats have

been adversely affected, and whether mitigatory actions are required to address harm from

increased pollution that occurred due to the EPA Policy." Pls.' Mem. 20. This completely

undermines Defendants' baseless assertion that Plaintiffs have not identified any meaningful

relief. Defs.' Opp'n Mem. 20.

Furthermore, the case law that Defendants rely on regarding mootness when an agency

action is terminated is inapplicable in the context of the ongoing consultation requirement. For

example, Defendants' reliance on *Home Builders* is entirely misplaced as that case is easily

---

[3] This is reiterated in the Services Consultation Handbook. *See* ENDANGERED SPECIES
CONSULTATION HANDBOOK 8-1 (1998), https://www.fws.gov /endangered/esa-
library/pdf/esa_section7_handbook.pdf [hereinafter the "Handbook"].

distinguishable. In *Home Builders*, the Plaintiffs brought ESA and APA claims against FWS regarding a policy that interpreted the phrase "significant portion of its range" within the definition of "endangered species." *See Nat'l Ass'n of Home Builders v. Salazar*, 827 F. Supp. 2d 1, 2-3 (D.D.C. 2011). The claims, however, did not include failure to consult under Section 7. Rather, the plaintiffs argued that the policy, which was issued by a memorandum, did not go through the APA notice and comment process, and that the Service's interpretation of that language violated the ESA. *Id.* at 3. Those claims, however, were mooted because "[i]n response to the[] lawsuit" the memorandum was withdrawn, *id.*, and FWS stated its intent to comply with the APA notice and comment process if it issued new guidance. *Id.* at 8. Therefore, the APA claim was clearly moot, and because the policy itself was no longer in effect, any decision as to its compliance with the ESA would be advisory. *Id.* That is very different from the issue before this Court, where EPA has an *ongoing* duty to consult to ensure that its Policy has not caused adverse effects that must be addressed to prevent jeopardy.

Moreover, even if Plaintiffs' challenge could otherwise be deemed moot on the grounds that there is no remaining relief—which is not the case—the challenge would still be justiciable in view of well-recognized exceptions to the mootness doctrine. First, EPA's action is capable of repetition yet evading review due to its finite duration—especially since the pandemic that justified it in the first instance is still raging. This exception to the mootness doctrine applies to challenged actions that are of a short duration—such as the EPA Policy, which had no specific timeframe, was in place for 5 months, and could be terminated or reinstated at any time—and where there is a reasonable expectation that it will occur again. *Van Wie v. Pataki*, 267 F.3d 109, 113-14 (2d Cir. 2001) (internal quotation marks and brackets omitted). While Defendants have submitted a declaration stating that EPA has no intention of reinstating the Policy, the COVID-

19 pandemic is ongoing, and even increasing. It is therefore reasonable to anticipate that the same circumstances that previously justified the Policy could be resurrected.

Second, a distinct exception to mootness comes into play when a defendant has voluntarily halted a challenged action. In such circumstances, "a defendant that voluntarily ceases activities challenged by the plaintiff, and then moves to dismiss on the grounds of mootness, bears a 'heavy burden' of proof to demonstrate that the challenged action will not happen again." *Cmty. Hous. Trust v. Dep't of Cons. and Reg. Affairs*, 257 F. Supp. 2d 208, 218 (D.D.C. 2003). Defendants have not met that burden here. Since EPA could reinstate the Policy at any time and then once again terminate it if challenged in court, declaratory relief is appropriate. *See Haley v. Pataki*, 60 F.3d 137, 141 (2nd Cir. 1995) ("we may review an otherwise moot appeal if it presents issues that are 'capable of repetition, yet evading review'") (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).

## III.   PLAINTIFFS HAVE ESTABLISHED DEFENDANTS VIOLATED THE ESA BY FAILING TO CONSULT ON THE EFFECTS OF THE POLICY

### A. *EPA's Decision to Implement the Policy was Patently an Agency "Action."*

As set forth in Plaintiffs' opening brief, the EPA Policy falls squarely within the broad definition of agency action that necessitates Section 7 consultation. Defendants' argument in response—that the EPA Policy is not an "action" because it was a statement of what the EPA would *not* do—borders on the nonsensical. As the Supreme Court has explained, "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the [ESA]." *TVA v. Hill*, 437 U.S. 153, 173 (1978). It requires that "[e]ach Federal agency shall, in consultation with and with the assistance of [FWS and/or NMFS] insure that *any action* authorized, funded, or carried out by such agency [] is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse

modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2) (emphasis added). This "mandate applies to *every discretionary action*—regardless of the expense or burden its application might impose." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 671 (2007) (emphasis added).

Defendants' attempt to redefine "action" in the context of the EPA Policy is baseless, since it is the affirmative issuance of the Policy itself that is the operative action, rather than any underlying decisions not to enforce environmental legal obligations during the pandemic as to particular permittees. Therefore, while Plaintiffs' claims concern the EPA's failure to consult, this is not a "failure to act" case, as with the cases that Defendants' rely on where the agency failed to take any action at all. For example, in *W. Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006), the court dismissed because the Bureau of Land Management had *failed to exercise its discretion* to regulate certain vested rights-of-way held by private landowners to divert water for irrigation. Because the agency had merely acquiesced and took no specific action, there was no agency action that required consultation. This case, however, presents the opposite situation. As Defendants admit, the EPA Policy was an affirmative action intended to exercise and announce EPA's enforcement discretion, Defs.' Opp'n Mem. 21, and therefore the issuance of the Policy itself was an affirmative agency action that requires consultation.

The other cases Defendants rely on likewise involved challenges to an agency's failure to take specific acts regarding individual projects, but, again, that is a far cry from the case before this Court. Plaintiffs have not challenged the EPA's application of enforcement discretion to a specific permittee, which could be seen as mere "inaction." Rather, what is at issue here is EPA's issuance of a broad policy, which has sweeping implications for environmental compliance across the country. The "failure to act" cases that Defendants rely on are therefore inapposite and

Defendants' attempt to portray this as a "negative" rather than an "affirmative" act mistakes the result of the Policy—i.e., the decision not to exercise enforcement of permit obligations—with the issuance of the Policy itself, which is clearly an affirmative agency action.

Defendants fail to grasp that the ESA implementing regulations broadly define "action" to mean "[a]ll activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the "promulgation of regulations," the "granting of . . . permits," and all "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02. Defendants advance no legitimate argument that the issuance of the Policy was not a discretionary action that was "carried out" by the EPA. If the Court were to accept Defendants' twisted logic, it would render the duty to prevent jeopardy meaningless in countless situations where an agency takes an affirmative action to issue a policy that adversely affects listed species, simply because that agency is announcing what it will not be doing, even where that decision "directly or indirectly caus[es] modifications to the land, water, or air" that "may affect" listed species, thereby triggering the ESA's clear mandate to ensure against jeopardy through consultation. 50 C.F.R. §§ 402.02, 402.14; *Karuk Tribe*, 681 F.3d at 1020.

Indeed, under Defendants' contorted reasoning, the EPA could announce that it will never again enforce myriad environmental laws—for any reason or no reason—and that would somehow constitute "inaction" that could avoid Section 7 consultation. That makes no legal or logical sense and should be soundly rejected by the Court.

### B. The EPA's Issuance Of The Policy Certainly "May Affect" Listed Species.

There can be no doubt that the EPA Policy meets the low "may affect" trigger for consultation under ESA Section 7. The term "may affect" is broadly construed to include "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character," 50 C.F.R.

§ 402.14(a), and thus the consultation requirement is "easily triggered." Interagency Cooperation – Endangered Species Act of 1973, As Amended, 51 Fed. Reg. 19,926, 19,949-50 (June 3, 1986); *see also Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 13 (D.D.C. 2014) ("[t]he 'may affect' threshold for triggering the consultation duty under [S]ection 7(a)(2) is low") (citing *Karuk Tribe*, 681 F.3d at 1027).[4] As set forth in Plaintiffs' opening brief and above, the EPA Policy—which provides that EPA would cease enforcing certain environmental legal obligations, including monitoring and reporting where listed species are present—certainly "may affect" listed species.

Indeed, the EPA itself recognized that the COVID-19 pandemic "may affect the ability of an operation to meet enforceable limitations on" water discharges, and the Policy ensures regulated entities that they will not be held accountable for such exceedances. As explained, it makes no difference whether such discharges are purposeful or a result of limitations due to COVID-19. Regardless of the reason, the EPA has a duty to ensure—through consultation with the Services—that by allowing noncompliance of environmental legal obligations, it has not jeopardized listed species.

Plaintiffs' arguments certainly do not depend on some uncertain causal chain, as Defendants argue. Defs.' Opp'n Mem. 23. Rather, the record indicates that there is a clear connection between enforcement of environmental legal obligations and compliance with permit

---

[4] Rather than apply Section 7's low "may affect" threshold for triggering consultation, Defendants argue that there must be a "but for" relationship between the agency action and the impact to listed species. Defs.' Opp'n Mem. 21. That, however, gets EPA nowhere. There is no evidence in the record that EPA made any assessment whatsoever as to whether there was a "but for" relationship between its Policy and effects on listed species. Further, there *is* evidence that there indeed may be such a relationship, which is all that is necessary to trigger consultation, during which the expert agencies will opine on the nature and extent of such impacts and what is necessary to ameliorate them. Until EPA conducts such analyses, the full effects cannot be known. But regardless, the trigger here is "may affect," which is patently not a "but for" analysis.

requirements; that the EPA Policy was relied on by hundreds, if not thousands, of regulated entities that were unable to comply with permit requirements across the country; and that there are at least several examples in the small data set that Plaintiffs were able to obtain showing listed species in receiving waters where NPDES permittees were unable to comply with legal obligations. That is a straightforward chain that evidences a significant concern for listed species. Were it not for this causal chain, EPA's environmental regulatory schemes under the Clean Water Act and other environmental statutes would make little sense, since EPA requires monitoring and threatens enforcement precisely because these actions reduce pollution. Hence, eliminating these controls will increase pollution, which certainly "may affect" listed species.

Even if that causal chain were not clear, any lack of specificity is due to the EPA's failure to make information on waivers under the Policy publicly available. As discussed above, the EPA's failure to consult is a procedural violation that undermines compliance with the substantive protections that the ESA provides listed species. And, because the EPA failed to consult, there *is* no analysis of the actual impacts of the Policy on listed species. Indeed, absent the consultation process that EPA is required to undertake, there is no way for anyone, including Plaintiffs, to fully understand the scope of what occurred under the Policy, and whether species have been jeopardized. That is the purpose of the mandatory consultation process that EPA failed to undertake.

In sum, it makes no difference that the Policy exhorts permittees to continue to comply with their permit requirements as much as possible, since the very purpose of the Policy is to acknowledge that compliance may not be possible, while also indicating that the EPA will forego enforcement of noncompliance, and therefore increased pollution may go unmonitored and unreported. For EPA to suggest that it should be able to ignore the very clear Congressional

mandate of the ESA to *prioritize* the preservation of listed species just because the Policy

*requests* permittees to refrain from polluting is groundless. *See Karuk Tribe*, 681 F.3d at 1020

(Congress made "a conscious decision . . . to give endangered species priority over the 'primary

missions' of federal agencies'") (quoting *Hill*, 437 U.S. at 185).

## IV.   PLAINTIFFS DO NOT SEEK SUMMARY JUDGMENT ON THE ALTERNATIVELY PLED APA CLAIM.

Plaintiffs included the Administrative Procedures Act claim as an alternative legal theory,

which is not necessary if the Court is to resolve this case on the merits of the ESA claim. Courts

in this Circuit have held that certain mandatory duties cannot be asserted absent a "date certain"

for compliance. *See Riverkeeper, Inc. v. Wheeler*, 373 F. Supp. 3d 443, 450-52 (S.D.N.Y. 2019).

In such a situation, Courts have allowed the claims to proceed on an "unreasonable delay" theory

under the APA. *See, e.g. NRDC, Inc. v. Fox*, 93 F. Supp. 2d 531, 542-48 (S.D.N.Y. 2000) *aff'd*,

268 F.3d 91 (2d Cir. 2001); *Riverkeeper, Inc. v. Wheeler*, No. 17 Civ. 4916, 2020 WL 1188455,

at *3-4 (S.D.N.Y. March 12, 2020). Here, EPA has not asserted this as a legal defense, and,

accordingly, the APA claim is duplicative and unnecessary.[5]

## V.   PLAINTIFFS' PROPOSED REMEDIES ARE APPROPRIATE.

Plaintiffs have requested narrow relief to address the harm to their interests: that EPA

undertake the required Section 7 consultation to ensure that the Policy did not jeopardize listed

---

[5] Plaintiffs, however, note that the APA claim is not precluded here. Defendants' cherry-picked quote in support of their argument is a misrepresentation of the holding in *Bennett*, where the U.S. Supreme Court held in no uncertain terms that "[n]othing in the ESA's citizen-suit provision expressly precludes review under the APA, nor do we detect anything in the statutory scheme suggesting a purpose to do so." *Bennett*, 520 U.S. at 175. The other cases Defendants rely on, *Ctr. for Biological Diversity v. Hamilton*, 385 F. Supp. 2d 1330 (N.D. Ga. 2005), and *Bernstein/Glazer, LLC v. Babbitt*, 99 Civ. 1195, 2000 WL 32278 (S.D.N.Y. March 28, 2000), involved petitioners whose APA claims were precluded as a matter of law because the only means of relief available was through 16 U.S.C. § 1533, which is patently different than the ESA's citizen suit provision. *Id.* § 1540(g).

species. The record evidences that hundreds, if not thousands, of permittees sought waivers under the Policy, Pls.' Ex. F, Doc. 25-6, and establishes that the issuance of the Policy meets the low "may affect" threshold. It is therefore appropriate for the Court to order EPA to complete formal consultation, consistent with the Services' regulations. 50 C.F.R. § 402.05(b).

Defendants argue that Plaintiffs' proposed remedy is premature and cites two cases in support of their argument. Defs.' Opp'n Mem. 24-25. Both of these cases resulted in the court ordering the EPA to make an initial determination as to whether the EPA's action "may affect" listed species or critical habitat, and both cases are distinguishable from the present action; ''In *American Fuel*, the issue before the court was the potential for *future* land conversion as a result of a rule concerning the Renewable Fuel Program. *Am. Fuel & Petrochem. Mfcs. v. EPA*, 937 F.3d 559, 594 (D.D.C. 2019). This stands in stark contrast to the present case, where hundreds of polluters sought waivers for their noncompliance, and thus the harm *already* occurred. The present case is also distinguishable from *Center for Biological Diversity v. EPA*, *see* Defs.' Opp'n Mem. 25, where the EPA had previously issued an ecological risk assessment concerning the effects of the insecticide and had not totally disregarded the insecticide's potential deleterious effects, whereas here EPA made no effort to address the impacts of the Policy. 861 F.3d 174, 188-89 (D.C. Cir. 2017.

Plaintiffs' proposed remedies are also appropriate because Defendants failed to comply with the ESA's emergency consultation process. As explained, in emergency situations the ESA's implementing regulations require "[f]ormal consultation [to] be initiated as soon as practicable after the emergency is under control" 50 C.F.R. § 402.05(b). Defendants admit that the Policy was in response to "the COVID-19 public health emergency," Defs.' Opp'n Mem. 1, and Defendants' termination of the policy, *id.* at 7, reflects their belief that this emergency is

under control. In light of the aforementioned, it would be appropriate for the Court to now order a formal consultation. 50 C.F.R. §402.05; *see also* Handbook 8-1 to 8-5.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment, and grant Plaintiffs' Motion for Summary Judgment.

Dated:  White Plains, New York                      Respectfully submitted,
        December 18, 2020

                                                    s/ Todd D. Ommen
                                                    Todd D. Ommen (TO-1340)
                                                    Karl S. Coplan (KC-3877)
                                                    Daniel Conant, Legal Intern
                                                    Pace Environmental Litigation Clinic, Inc.
                                                    78 North Broadway
                                                    White Plains, NY 10603
                                                    tommen@law.pace.edu
                                                    (914) 422-4343
                                                    *Attorneys for Plaintiffs Riverkeeper and*
                                                    *Waterkeeper*

                                                    */s/ Jared M. Margolis*
                                                    Jared M. Margolis (OR Bar No. 146145)
                                                    CENTER FOR BIOLOGICAL DIVERSITY
                                                    2852 Willamette St. # 171
                                                    Eugene, OR 97405
                                                    Phone: (802) 310-4054
                                                    Email: jmargolis@biologicaldiversity.org
                                                    *Attorneys for Plaintiff Center for Biological*
                                                    *Diversity*