```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
CENTER FOR BIOLOGICAL DIVERSITY,     :
et al.,                              :
                                     :
        Plaintiffs,                  :
                                     :   20-cv-6572 (JSR)
        -v-                          :
                                     :   OPINION
UNITED STATES ENVIRONMENTAL          :
PROTECTION AGENCY, et al.,           :
                                     :
        Defendants.                  :
                                     :
-------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

This suit challenges the failure of the U.S. Environmental Protection Agency ("EPA") to consult with the Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") in connection with a temporary nonenforcement policy (the "Policy") the EPA published in March 2020 in response to the pandemic. The Endangered Species Act ("ESA") and its implementing regulations require that an agency consult with the FWS and/or the NMFS before taking any action that may affect endangered or threatened species. In an emergency, the agency may informally notify the NMFS and/or the FWS, take the action, and engage in formal consultation with the FWS and/or the NMFS thereafter.

In March 2020, the EPA published the Policy, which announced that it "d[id] not expect to seek penalties for violations of" certain routine requirements, including sampling, testing,

training, and reporting, if the noncompliance was caused by COVID-19.[1] The EPA did not consult with the FWS or the NMFS regarding the Policy, including under the provision for emergency consultation. Plaintiff non-profit organizations sued. The Policy has now terminated, but plaintiffs seek to compel the EPA to engage in post-hoc consultation with the FWS and the NMFS.

Now before the Court are the parties' cross-motions for summary judgment. One of the principal disputed issues, and ultimately the dispositive issue, is standing. The EPA does not deny that if excess pollutants were to enter the habitat of the Atlantic and shortnose sturgeons -- endangered species studied by members of the plaintiff organizations -- then those members would suffer an injury sufficient to confer standing. However, the defendants maintain that the plaintiffs offer no evidence from which a jury could reasonably infer that the Policy caused a real risk of excess discharge into sturgeon habitat. The Court agrees. Therefore, by bottom-line order, ECF No. 40, the Court granted the defendants' motion and denied the plaintiffs' motion.

---

[1] Susan Parker Bodine, EPA, COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program (Mar. 26, 2020), https://www.epa.gov/sites/production/files/2020-03/documents/oecamemooncovid19implications.pdf.

BACKGROUND

A.  The Endangered Species Act

Congress enacted the ESA in 1973 to preserve endangered and threatened species. ESA Section 7 provides, in pertinent part:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior, or the Secretary of Commerce with respect to certain marine life], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat . . . . In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). An implementing regulation provides, "Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, [with exceptions not relevant here]." 50 C.F.R. § 402.14(a). "Action means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies . . . ," including, inter alia, "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

When formal consultation is required, the pertinent agency must send the NMFS and/or the FWS certain information, id. 402.14(c), and "[f]ormal consultation concludes within 90 days after its initiation unless extended" by mutual agreement between

3

the agency and the NMFS and/or the FWS, id. 402.14(d). The regulations further provide that

> where emergency circumstances mandate the need to consult in an expedited manner, consultation may be conducted informally through alternative procedures that [NMFS or FWS] determines to be consistent with the requirements of sections 7(a)-(d) of the [ESA]. This provision applies to situations involving acts of God, disasters, casualties, national defense or security emergencies, etc. Formal consultation shall be initiated as soon as practicable after the emergency is under control.

Id. 402.05 (lettering omitted).

B.  The Temporary Nonenforcement Policy

On March 26, 2020, the EPA issued a memorandum entitled "COVID-19 Implications for EPA's Enforcement and Compliance Assurance Program." SUF ¶ 1.[2] The Policy provides that the EPA generally "does not expect to seek penalties for violations of routine compliance monitoring, integrity testing, sampling, laboratory analysis, training, and reporting or certification obligations in situations where the EPA agrees that COVID-19 was the cause of the noncompliance and the entity provides supporting documentation to the EPA upon request." Policy 3. Despite this announcement of the EPA's general intention, the EPA continued to have enforcement discretion. SUF ¶ 67. The Policy further

---

[2] "SUF" refers to the parties' Rule 56.1 Statements of Undisputed Facts, which are numbered sequentially. SUF ¶¶ 1-63 refer to Defendants' Response to Plaintiffs' Rule 56.1 Statement, ECF No. 33. SUF ¶¶ 64 et seq. refer to Plaintiffs' Response to Defendants' Rule 56.1 Statement, ECF No. 38.

4

provides that, "[i]n general, absent exigent circumstances, the EPA does not plan to ask facilities to 'catch-up' with missed monitoring or reporting if the underlying requirement applies to intervals of less than three months." Id.

The Policy contains exceptions; for example, it states that "the EPA has heightened expectations for public water systems. The EPA expects operators of such systems to continue normal operations and maintenance as well as required sampling to ensure the safety of our drinking water supplies." Id. 6. The Policy declines to "relieve[] any entity from the responsibility to prevent, respond to, or report accidental releases of oil, hazardous substances, hazardous chemicals, hazardous waste, and other pollutants, as required by federal law," and disclaims any "willingness to exercise enforcement discretion in the wake of such a release." Id. at 7.

Permittees across the country submit certain reporting data to the EPA using the National Pollutant Discharge Elimination System ("NPDES"). On March 31, 2020, the EPA issued a memorandum advising permittees to use the code "Z" in the NPDES system if data was missing or incomplete because of COVID-19 and "the permittee believes the . . . Policy applies to their routine monitoring or sampling noncompliance." David A. Hindin, EPA, Temporary Advisory for National Pollutant Discharge Elimination System (NPDES) Reporting in Response to COVID-19 Pandemic 2 (Mar.

5

31, 2020) (the "NPDES Advisory"). Recognizing that some permittees would be unable to promptly update their internal systems to add the code "Z" as an option, the NPDES Advisory suggested, in the alternative, the use of "K" (natural disaster) or another rarely used code. Id. The NPDES Advisory explained that if an entity submitted missing or incomplete data with code "Z," then a non-receipt violation would not be automatically generated. Id. However, "EPA and authorized NPDES Programs may use the COVID-19 code if follow-up is needed to determine if the criteria set forth in the . . . Policy for use of enforcement discretion are met." Id. It is undisputed that as of July 7, 2020, permittees had used the "Z" code to explain missing or incomplete data on more than 350 occasions. Ommen Decl. Ex. F, ECF No. 25-6.

The EPA did not consult with the FWS or the NMFS under Section 7 of the ESA and its implementing regulations regarding the Policy, not even using the procedures for emergency consultation. On June 29, 2020, the EPA issued an addendum to the Policy, providing that it would terminate on August 31, 2020, which it did. SUF ¶¶ 69-70.

C. Plaintiffs' and Their Members' Interests in the Action

Plaintiffs are the Center for Biological Diversity, Waterkeeper Alliance, Inc., and Riverkeeper, Inc. The Center for Biological Diversity is a nonprofit organization with more than 81,843 members "dedicated to the preservation, protection, and restoration of biodiversity, native species, ecosystems, and

6

public lands through science, policy, education, and environmental law." SUF ¶¶ 21-22. Waterkeeper Alliance is a not-for-profit umbrella corporation, connecting more than 350 member and affiliate organizations, which cumulatively have tens of thousands of members in the U.S. SUF ¶ 51. Waterkeeper Alliance seeks to protect water quality. SUF ¶ 52. Riverkeeper is a 501(c)(3) not-for-profit environmental organization with approximately 3,807 members. SUF ¶ 59. Its mission includes safeguarding the Hudson River and its tributaries. SUF ¶ 60.

Martin J. Hamel, Ph.D., a member of the Center for Biological Diversity, is a fish biologist focusing on endangered fish species, such as Atlantic and shortnose sturgeon. SUF ¶¶ 33-35. He has spent, and plans to continue to spend, a considerable amount of time studying and writing about sturgeon. SUF ¶ 39. John R. Waldman, Ph.D., a member of Riverkeeper, is an aquatic conservation biologist, focusing on endangered fish species, such as Atlantic and shortnose sturgeon. SUF ¶¶ 41-43. Sturgeon are vulnerable to harm from pollution from industrial and wastewater treatment plant discharge. SUF ¶ 45.[3] The loss of sturgeon would harm Hamel and Waldman's abilities to research, study, and/or enjoy the fish. SUF ¶¶ 38, 47.

---

[3] Some aspects of SUF ¶ 45 are disputed, but this fact is not.

D. Prior Litigation

The Policy was the subject of two prior lawsuits in this Circuit. In New York v. EPA, No. 20-cv-3714 (CM) (S.D.N.Y. 2020), nine states sought a preliminary injunction against the Policy. The action was stayed once the EPA announced that the Policy would terminate on August 31, and thereafter it was voluntarily dismissed.

In Natural Resources Defense Council v. Bodine, No. 20-cv-3058 (CM), 471 F. Supp. 2d 524 (S.D.N.Y. July 8, 2020), environmental groups challenged the speed of EPA's response to an emergency rulemaking petition the organizations had filed. The environmental groups had "petitioned EPA to publish a rule, on an emergency basis and effective immediately, that would require any entity that suspends monitoring and reporting because of the COVID-19 pandemic to provide written notice to EPA, which EPA would then make available to the public." Id. at 527. Fifteen days after filing the emergency rulemaking petition, plaintiffs sued, claiming that the agency had failed to respond to their petition "within a reasonable time," as required by the Administrative Procedure Act, 5 U.S.C. § 555(b).

On cross-motions for summary judgment, then-Chief Judge McMahon dismissed the case for lack of standing. She held that, while the plaintiff organizations claimed a right to information, "[n]o rule requiring EPA to report the information of which

Plaintiff are being deprived is presently on the books." Id. at 535. Although the plaintiffs also claimed injury through environmental harms, the Court found that "Plaintiffs' claim to [any such] injury in fact is built on multiple layers of speculation" without "a scintilla of evidence." Id. at 537.

To prove standing, the plaintiffs had offered affidavits describing their members' fears that the Policy would lead to pollution increases, combined with published articles showing, in general, "that the failure to report and monitor correlates with increased pollution." Id. However, plaintiffs did not provide evidence substantiating their fears by linking that general principle to the Policy. "Since [Plaintiffs] admit that the Plaintiff organizations themselves engage in monitoring activities, their failure to offer more than speculation about what might happen dooms their cause." Id.

> The Chief Judge reasoned:
>
> To credit Plaintiffs' argument would require not only accepting that the Policy will cause regulated entities to cease monitoring and reporting temporarily because their employees are locked down due to COVID and unable to come to work -- a proposition I have no difficulty embracing -- but also that the EPA's policy of selective nonenforcement (bounded by certain requirements imposed on the regulated entities) will in turn cause those entities to increase pollution and create chemical safety hazards -- this despite the fact that the Policy does not change any substantive requirements, let alone substantive emissions or discharge limits, or alter the ability of EPA, states, and citizens to sue where there are such environmental law violations.

Id. at 539-40.

Plaintiffs filed the instant suit on August 18, 2020. The parties agreed to forgo discovery and proceed directly to summary judgment.[4]

## LEGAL STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court is required to resolve all ambiguities and draw all factual inferences in favor of the non-moving party. Rattner v. Netburn, 940 F.2d 204, 209 (2d Cir. 1991).

Article III of the Constitution extends federal courts' jurisdiction only to cases and controversies, and the Supreme Court has interpreted this to mean that federal jurisdiction exists only when the plaintiff has standing -- that is, "a personal stake in the outcome of the controversy." Warth v. Seldin, 422 U.S. 490, 498 (1975) (internal quotation marks omitted).

To show standing, a plaintiff must demonstrate (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

---

[4] For this reason, although plaintiffs argue under Federal Rule of Civil Procedure 56(d) that they should be permitted to take additional discovery, that argument lacks merit. Plaintiffs chose to proceed directly to summary judgment and cannot now be heard to complain about insufficient discovery.

favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). An organization may demonstrate standing in the same way as a natural person ("organizational standing") by demonstrating these same three requirements of injury-in-fact, traceability, and redressability. N.Y. Civil Liberties Union v. N.Y.C. Transit Auth., 684 F.3d 286, 294 (2d Cir. 2012). Alternatively, an organization may demonstrate standing on behalf of its members ("associational standing") by demonstrating "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).

A plaintiff's burden to plead and prove standing corresponds to its burden to plead and prove the elements of its cause of action at each stage of a case. Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). Therefore, a party is entitled to summary judgment as to standing only if it establishes that, viewing the evidence and drawing reasonable inferences in the light most favorable to the non-moving party, there are no genuine disputes of material fact regarding whether a plaintiff has standing. See Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329 (1999).

Traditional injury-in-fact requires proof of an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Spokeo, 136 S. Ct. at 1548. These traditional requirements still apply but are viewed in a more generous light when plaintiffs claim a procedural injury. Massachusetts v. E.P.A., 549 U.S. 497 (2007). Specifically, "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." Id. at 518.

The Second Circuit described how to analyze standing when a plaintiff claims procedural injuries in Strubel v. Comenity Bank, 842 F.3d 181 (2d Cir. 2016). The Second Circuit construed the Supreme Court's decision in Spokeo to mean that "an alleged procedural violation can by itself manifest concrete injury where Congress conferred the procedural right to protect a plaintiff's concrete interests and where the procedural violation presents a 'risk of real harm' to that concrete interest." Id. at 190. However, "even where Congress has accorded procedural rights to protect a concrete interest, a plaintiff may fail to demonstrate concrete injury where violation of the procedure at issue presents no material risk of harm to that underlying interest." Id.[5]

---

[5] Other circuits apply similar standards. For example, the Ninth Circuit has held that "[i]n the context of procedural violations,

Putting all this together following Spokeo and Strubel, in order to demonstrate associational standing on behalf of its members based on a procedural injury a plaintiff organization must show seven things: (1) Congress accorded procedural rights to plaintiff's member(s); (2) those procedural rights were created to protect a concrete interest held by member(s); (3) the plaintiff has shown a "risk of real harm" to that concrete interest; (4) that risk of real harm is fairly traceable to the procedural violation; (5) that risk of real harm could be redressed by the Court; (6) the protected interest is germane to the plaintiff

---

the injury-in-fact requirement is met if 'the procedures in question are designed to protect some threatened concrete interest of [the petitioner] that is the ultimate basis of his standing.'" National Family Farm Coalition v. EPA, 966 F.3d 893, 909 (9th Cir. 2020) (quoting Salmon Spawning & Recovery All. v. Gutierrez, 545 F.3d 1220, 1225 (9th Cir. 2008)) (second alteration in original). Similarly, under D.C. Circuit precedent, a plaintiff claiming a procedural injury can demonstrate standing through "two causal links: one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury." Ctr. for Biological Diversity v. EPA, 861 F.3d 174, 184 (D.C. Cir. 2017) (internal quotation marks omitted) (alterations in original). The D.C. Circuit has explained that the second link in this causal chain need not demonstrate "that harm to [the plaintiff] has in fact resulted from the EPA's procedural failures; instead, it must demonstrate that there is a substantial probability that local conditions will be adversely affected and thus harm [the plaintiff]." Id. (internal quotation marks and citation omitted).

13

organization's purpose, and (7) the participation of individual members in the lawsuit is not required to afford relief.[6]

## DISCUSSION

The parties principally dispute parts (3) through (5) of this 7-part inquiry -- that is, whether the plaintiffs have shown a risk of real harm to a concrete interest held by their members that is fairly traceable to the Policy and redressable by the Court - but the Court will address each part in turn.

1. <u>Whether Plaintiffs' Members Have Procedural Rights</u>

There is no doubt that in this case the plaintiffs have satisfied the first requirement: Congress conferred procedural rights on the plaintiffs and their members through the citizen-suit provision of the ESA, which grants them the right to sue EPA for a failure to consult with the FWS and the NMFS.

2. <u>Whether the Procedural Rights Are Designed To Protect Plaintiffs' Members' Concrete Interests</u>

The second requirement is likewise satisfied because plaintiffs' members have concrete, substantive interests in certain endangered species -- specifically, the Atlantic and shortnose sturgeon. The "desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a

---

[6] Here, these last two requirements are not at issue. The EPA does not dispute that the interests the plaintiffs seek to protect are germane to their purposes, nor does the EPA argue that the presence of individual members is required in this lawsuit.

14

cognizable interest for purpose of standing." Lujan v. Defs. of Wildlife, 504 U.S. 555, 562-63 (1992). Plaintiffs have established that their members, including Hamel and Waldman, have not only aesthetic but also professional interests in the preservation of endangered sturgeon. And one purpose of the citizen-suit provision is to allow citizens to protect just such interests.

> 3-5. Whether Plaintiffs Have Shown "a Risk of Real Harm" to Their Members' Concrete Interests That Is Fairly Traceable to the Policy and Redressable by the Court

The next three requirements relate to the traditional three-prong standing inquiry, beginning with injury-in-fact. As previously noted, because plaintiffs allege procedural injury, they need not show the same degree of concrete, particularized, and actual or imminent harm that they would otherwise need to show, but they must nevertheless demonstrate a "risk of real harm" to plaintiffs' members' legally protected interest in the sturgeon that is fairly traceable to the Policy and redressable by the Court. Strubel, 842 F.3d at 190. This is the heart of the parties' dispute concerning standing.

The EPA does not deny that increased wastewater discharge poses a risk of real harm to sturgeon. The question is whether plaintiffs have shown that there was a real risk of increased wastewater discharge traceable to the Policy.

Plaintiffs' arguments for why there was a real risk of excess discharge are threefold. First, like the plaintiffs before Chief

15

Judge McMahon, they argue that the reason for any enforcement program in the first place is to ensure compliance. By removing the threat of civil penalties, the Policy, in plaintiffs' words, "essentially gave the green light for non-compliance, even if the Policy did not specifically remove [permittees'] obligations and [even if] such non-compliance could be blamed on the pandemic." Pls.' Opp. to Def'ts' Mot. for Summ. J., ECF No. 36, at 4 ("Pls.' Opp."). The EPA responds that, in assessing whether plaintiffs have shown an injury-in-fact, courts generally presume that "respondents will conduct their activities within the law." O'Shea v. Littleton, 414 U.S. 488, 497 (1974).

Each side has a point. On the one hand, the raison d'être of EPA's Policy was that the EPA recognized that, because of the pandemic, permittees might not be able to achieve full compliance with the law. The Court should not presume complete compliance with the law when the EPA itself presumes the opposite.

On the other hand, the Policy presumed routine <u>reporting deficiencies</u>, not excess <u>discharge</u>; plaintiffs must show a real risk of excess discharge in order to show a risk of real harm to sturgeon. Indeed, not only does the Policy not presume excess discharge; it requires permittees to notify EPA if they anticipate that COVID-19 or related monitoring failures could cause excess discharge. Plaintiffs offer no evidence that EPA received any such warnings, let alone ones germane to sturgeon.

16

In addressing these motions, the stage of the case matters because plaintiffs' theory is not implausible. It stands to reason that monitoring deficiencies could well lead to excess discharge. But such speculation is not enough because this is summary judgment. No matter how plausible plaintiffs' allegations, the Court cannot presume, without evidence, that permittees disobeyed the law by discharging excess pollutants.

Second, plaintiffs argue that the Court can infer a "potential increase in pollution from [the] hundreds, if not thousands, of waivers that permittees sought under the Policy." Pls.' Opp. 4. However, among the NPDES facilities that failed to provide complete data and used code "Z" to justify that failure, plaintiffs have identified only one that discharges into a sturgeon habitat. SUF ¶ 17 (disputed on unrelated grounds). The EPA responds that the use of NPDES code "Z" indicates a lack of reporting data, but it does not indicate that an entity emitted excess discharge (let alone that the one site discharging into a sturgeon habitat did so).

The EPA has the better of the argument. "Z" NPDES codes undeniably demonstrate monitoring failures, but that does not mean that they were coupled with excess discharge. Again, this is a summary judgment motion; a reasonable factfinder could not simply presume, without evidence, that monitoring failures caused excess discharges. Therefore, neither can the Court.

17

Finally, plaintiffs attempt to provide more concrete proof that there was a real risk of excess discharge by pointing to a single, non-peer-reviewed study by researchers at the American University School of Public Affairs. See Claudia Persico & Kathryn Johnson, The Effects of Increased Pollution on COVID-19 Cases and Deaths (Aug. 8, 2020, as rev'd Oct. 29, 2020), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3633446. The authors reviewed air quality data before and after EPA's announcement of the Temporary Nonenforcement Policy. They found that counties with 6 or more Toxic Release Inventory ("TRI") sites "saw a 14 percent increase in pollution on average following the EPA's rollback of enforcement, compared to counties with [1 to 5] TRI sites." Id. at 1.

The EPA responds that the study concerned air pollution, and the Court cannot reasonably infer from increased air pollution that there was an increased risk of water pollution -- let alone of water pollution at the single site that plaintiffs identified that used code "Z" and discharged into a sturgeon habitat.

Although the American University study comes a bit closer to the mark, the EPA ultimately has the better of this argument. The American University study is so far removed from the facts of this case that the plaintiffs seek to extrapolate from it more than a

factfinder reasonably could.[7] Consider each link in the inferential chain:

- Does the American University study demonstrate increased air pollution during the time of the Policy?

    o Yes, viewing the study in the light most favorable to plaintiffs, a reasonable juror could conclude that it does.

- Is the increase in air pollution fairly traceable to the Policy?

    o Perhaps. Drawing reasonable inferences in favor of the plaintiff, a jury could so find.

- Thus, can one reasonably infer that the Policy also posed a real risk of increased <u>water</u> pollution?

    o This is a close question. It is a very substantial logical leap; on the other hand, because this a case of procedural injury, the plaintiff need only show a "risk of real harm," not the same concrete, particularized, and actual or imminent harm that would otherwise be required. On this lower standard, drawing inferences in plaintiffs' favor, a reasonable juror might conclude that the American University study demonstrates a real risk of increased water pollution.

- Can one therefore infer a real risk that the Policy caused excess water pollution in the sturgeon habitat specifically?

    o This inference extrapolates too far. No juror could reasonably reach this specific conclusion about a particular aquatic habitat from the far different, far more general evidence about air pollution offered by the American University study.

In the end, even when viewing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in

---

[7] The Court does not consider the question whether this non-peer-reviewed study is rigorous enough to pass muster under <u>Daubert</u>.

19

their favor, a factfinder could not reasonably conclude from plaintiffs' scant evidence that there was a real risk of increased discharge in sturgeon habitat traceable to the Policy. Therefore, plaintiffs lack standing.

For the foregoing reasons, by bottom-line order, ECF No. 40, this Court denied the plaintiffs' motion for summary judgment and granted the defendants' motion for summary judgment.

The Clerk is respectfully directed to close this case.

SO ORDERED.

Dated:   New York, NY
         June 2, 2021

_____
JED S. RAKOFF, U.S.D.J.